**UNITED STATES of America, Plaintiff,**

v.

**JG–24, INC., Jorge Ortiz, Gloria Alvarez Nieves, Duramas, Inc., and Real Property Located at PR Road # 675, KM 4.0, Barrio Bajuras, Sector Los Chorros, Vega Alta, Puerto Rico, Defendants.**

No. CIV.00–1483(RLA).

United States District Court, D. Puerto Rico.

Aug. 12, 2004.

---

Elizabeth Yu, Myles E. Flint, Henry S. Friedman, Alfred S. Irving, Jr., Peter M. Flynn, U.S. Department of Justice Environmental Enforcement Section, U.S. Dept. of Justice, Silvia L. Carreno-Coll, U.S. Environmental Protection Agency, Washington, DC, Isabel Muñoz–Acosta, U.S. Attorney's Office Torre Chardón, San Juan, PR, for Plaintiff.

Benjamín Ortiz Belaval, Ortiz & Rodriguez, Manuel Catinchi–Betancourt, San Juan, PR, for Defendants.

Jorge Ortiz, Santurce, PR, Pro se.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

ACOSTA, District Judge.

### INTRODUCTION

Plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA") instituted this suit involving two sites, the J & G Site in Vega Alta, Puerto Rico, and the Cataño facility in Cataño, Puerto Rico.

With respect to the J & G Site, the United States claims as follows:

(a) Claim for cost recovery under Section 107(a) of the Comprehensive

Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(a) (hereinafter "CERCLA"), for the costs of actions the United States has taken in response to the release or threatened release of CERCLA hazardous substances at the J & G Site;

(b) Several claims for failure to comply with a statutory provision of and regulations promulgated under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, et seq., for which the United States seeks injunctive relief in the form of continuation post-trial of the provisions of paragraph 2 of the Stipulation endorsed by the Court on January 31, 2003 herein (docket # 84) and civil penalties pursuant to Section 3008 of RCRA, 42 U.S.C. § 6928; and

(c) Claim for civil penalties under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), for failure to comply with the EPA Administrative Order requesting access for sampling and investigative activities.

With respect to the Cataño facility, the United States' claim is for injunctive relief and civil penalties under Section 3008 of RCRA, for failure to respond to an EPA information request pursuant to Section 3007 of RCRA, 42 U.S.C. § 6927.

## TABLE OF CONTENTS

I. FINDINGS OF FACT ...................................................... 20
A. Defendant Jorge Ortiz ................................................. 20
B. J & G Site ............................................................ 20
 1. Location ......................................................... 20
 2. Manufacturing Operations ........................................ 20
C. Cataño Facility ....................................................... 21
 1. Location ......................................................... 21
 2. Facilities ....................................................... 21
D. Defendant Jorge Ortiz' Companies ..................................... 22
 1. JG–24, Inc. ("JG–24") ............................................ 22
 a. Incorporation ................................................. 22
 b. JG–24 Has Not Been Operated As a Corporation .................. 22
 c. JG–24 Lost Its Corporate Status and is a Proprietorship ....... 22
 d. Jorge Ortiz is the Proprietor and Person in Control of JG–24 .. 23
 2. Distribuidora K–Aribe /D.T. Karibe, Inc. .......................... 23
 a. Incorporation ................................................. 23
 b. Distribuidora K–Aribe Has Not Been Operated As a Corporation .. 24
 c. Distribuidora K–Aribe/D.T. Karibe's Corporate Status Expired .. 24
 d. Distribuidora K–Aribe is a Proprietorship and Jorge Ortiz is the Proprietor ................................................ 24
 3. Fiberglass DuraMas/Dura Mas ...................................... 26
 a. Incorporation ................................................. 26
 b. Fiberglass Dura Mas Has Not Been Operated As a Corporation .... 26
 c. Fiberglass Dura Mas Is Not a Corporation ..................... 27
 d. Fiberglass Dura Mas is a Proprietorship and Jorge Ortiz is the Proprietor ................................................... 27
 4. Jorge Ortiz' Companies are Commingled and Linked ................. 29
E. Facts Relating to United States' Claims re J & G Site ................ 30
 1. Ownership of the J & G Site ...................................... 30
 2. December 3, 1997 Inspection ...................................... 30
 3. February 1998 Initial Sampling and Inspection ................... 31
 4. Access .......................................................... 32
 5. April 1999 Sampling Investigation ............................... 33
 a. Site Conditions ............................................... 33
 b. Site Practices ................................................ 34

 c. Chemicals Used .................................................34
 d. Releases and Threatened Releases ....................................35
 e. Sample Results—Superfund Support Team Sampling Report ..............36
 f. Soil Boring Results .........................................37
 g. Attempt to Sample Local Groundwater ..............................38
 6. Decision to Conduct Removal Action ...................................38
 7. March 2000 Overflight.........................................39
 8. May/June 2000 Inspection ........................................39
 9. Access and Cease and Desist Stipulation ...............................40
 10. RCRA Violations ...........................................40
 11. Removal Action ...........................................43
 12. Groundwater monitoring........................................44
 13. Costs ..................................................45
 14. In Rem Claim Facts ..........................................52
 15. Injunctive Stipulation .........................................53

F. Facts Relating to United States' Claim re Cataño Facility ........................53
 1. Ownership of the Cataño Property .....................................53
 2. Chemicals Stored and Used at the Cataño Facility ..........................54
 3. Current Fiberglass Product Manufacturing at the Cataño Facility For
 Jorge Ortiz ..............................................54
 4. Inspections and RCRA Information Request ...............................55
 5. Control Over Environmental Decisionmaking at the Cataño Facility ...........58

II. CONCLUSIONS OF LAW ..............................................59
A. Defendants are Liable for the United States Costs under CERCLA Relating to
 the J & G Site ..............................................59
B. Defendants are Liable for Violations of RCRA at the J & G Site ...................67
C. Defendants are Liable for Failure to Provide Access to the J & G Site...............71
D. Defendants Jorge Ortiz and Duramas are Liable for Failure to Respond to the
 RCRA Information Request Concerning the Cataño Facility ....................72

# FINDINGS OF FACT[1]

## A. *Defendant Jorge Ortiz*[2]

1. Defendant Jorge Ortiz' middle name is Joaquin, and his surname from the maternal side is Romany. (Stipulated Fact No. 4)

2. Defendant Jorge Ortiz' Social Security Number is 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. (Stipulated Fact No. 226)

3. Defendant Jorge Ortiz' address is Calle Diez de Andino 111, Santurce, PR. (Plaintiff Exh. 176, p. 8; Stipulated Fact No. 238)

## B. *J & G Site*

### 1. *Location*

4. The J & G Site is approximately 40 acres in size and is located at PR Road # 675, Km. 4.0, Barrio Bajuras, Sector Los Chorros, Vega Alta, Puerto Rico. (Stipulated Fact No. 7)

### 2. *Manufacturing Operations*

5. Fiberglass products were made at the J & G Site. The operations involved fiberglass, solvents, resins, and catalysts, and also acetone, styrene and methyl ethyl ketone peroxide. (Stipulated Fact No. 235)

6. Acetone, styrene, and methyl ethyl ketone peroxide are CERCLA hazardous

[1] All of the Exhibits referred to herein have been admitted into evidence.

[2] "Jorge Ortiz", "Jorge J. Ortiz", "Jorge Ortiz Romany", and "Joaquin Roman" herein refer to the Defendant Jorge Ortiz in this case.

substances. (Michael Ferriola Direct and Michael Mercado Direct testimony; 40 C.F.R. § 302.4)

7. The fiberglass product manufacturing operations at the J & G Site began in approximately 1992 and continued through at least July 2000 (when the Answer to the initial Complaint in this action was filed). Defendant JG–24 used the J & G Site to manufacture fiberglass products such as swimming pools, water tanks, boats, and horse carriages. (Answer, ¶ 11, and Complaint, ¶ 11,[3] Plaintiff Exh. Exhibit 14,[4] p. 2.)[5]

8. Jorge J. Ortiz personally went to the supplier or suppliers to buy materials including resins, solvents, and catalysts used in the production at the J & G Site and took them personally to the J & G Site. The usual procedure was to buy these materials using cash. The quantities of the materials used depended on the demand for finished products (boats, water tanks, car tops, swimming pools, etc.). (Stipulated Fact No. 10)

9. During the manufacture of fiberglass products at the J & G Site, the operations at the Site included molding, cutting and finishing various fiberglass products. The manufacturing procedure included the following steps: 1) preparing the mold for the specific product; 2) spreading a first layer of resin solution over the molding and covering it with fiberglass; 3) the fiberglass layer is dried in the mold, and additional layers of resin solution are spread to get the appropriate thickness. (Stipulated Fact No. 11)

10. The manufacture of fiberglass products at the J & G Site involved the spraying of resins on products being made. Gelcoat was also sprayed on some products being made, such as pools and car tops. The pools were painted with blue gelcoat, and the car tops were painted with white gelcoat. (Alberto Mendez Deposition Excerpt, p. 42, lines 23–25, p. 43, ln. 1–25, p. 44, ln. 1–10, 16–25, p. 45, lines 1–3, admitted into evidence through grant of the Motion Designating Deposition Excerpts; Michael Mercado Direct testimony)

### C. Cataño Facility

#### 1. Location

11. There is a property of approximately two (2) acres in size that is located at PR Road 165, Km. 2.5, Cataño, Puerto Rico 00963 (the "Cataño property" or "Cataño facility" or "Distribuidora K–Aribe facility"). (Stipulated Fact No. 8)

#### 2. Facilities

12. The Cataño property includes a showroom for fiberglass products, a sales area, and an administrative office. (Stipulated Fact No. 122)

13. The Cataño facility also includes a mixing room in which transfer activities of raw materials from bulk to smaller containers are performed. The Cataño facility also includes a

---

3. See excerpts of Answer and Complaint admitted into evidence through the Court's grant of the Motion Designating Portions of Deposition Transcripts and Certain Statements Made by Defendants in Answers to the Complaint and to a Document Request ("Motion Designating Portions of Deposition Transcripts").

4. Plaintiff Exh. 14 is also in the Administrative Record, Plaintiff Exh. 134, at tab 2.

5. Where more than one source for the Finding of Fact is cited, the Finding of Fact is based on a combination of the sources.

backyard area. Some fiberglass products are sometimes manufactured in the backyard area. (Plaintiff Exh. 119)

14. Signs have been posted at the Cataño facility at various times, including 1997, with the names "Distribuidora KAribe" and "DuraMas." (Francisco Claudio Direct testimony)

### D. Defendant Jorge Ortiz' Companies

#### 1. Defendant JG–24, Inc. ("JG–24")

##### a. Incorporation

15. Defendant JG–24, Inc. ("JG–24") was at one point a corporation incorporated under the laws of the Commonwealth of Puerto Rico, and JG–24 has had a principal place of business at the J & G Site. (Stipulated Fact No. 1)

16. Defendant Jorge Ortiz was one of the incorporators of JG–24, Inc. (Stipulated Fact No. 5)

17. JG–24, Inc. was incorporated by Jorge J. Ortiz, Yanette Maldonado, and Francisco Vizcaíno. (Stipulated Fact No. 210)

18. The incorporation papers for JG–24, Inc. list Yanette Maldonado as the registered agent for JG–24, Inc. The incorporation papers for JG–24, Inc. state that her address is Carr. 860, Lizette Apt. # 906, Carolina, P.R. 00630. No change to the registered agent for JG–24, Inc. or the address of the registered agent for JG–24, Inc. has been filed with the Secretary of State's office. (Stipulated Facts No. 211, 212)

##### b. JG–24 Has Not Been Operated As a Corporation

19. To the best of the knowledge of Jorge Ortiz, no stock was ever issued by JG–24, Inc. (Stipulated Fact No. 244)

20. JG–24 never issued any bylaws. (Stipulated Fact No. 213)

21. There are no such things as minutes, meetings of Board of Directors, or shareholders regarding JG–24, Inc. (Stipulated Fact No. 214)

22. JG–24 does not have directors or a board of directors. (Stipulated Fact No. 215)

23. To the best of the knowledge of Jorge Ortiz, no annual (or other periodic) reports of JG–24, Inc. exist for any times between 1990 and the present. (Stipulated Fact No. 245)

24. There is no record of any annual reports required to be filed by corporations having been filed by JG–24, Inc. with the office of the Secretary of State of Puerto Rico. (Stipulated Fact No. 219)

25. There is no record of any annual fees required to be paid by corporations having been paid by JG–24, Inc, to the office of the Secretary of State of Puerto Rico. (Stipulated Fact No. 220)

##### c. JG–24 Lost Its Corporate Status and is a Proprietorship

26. There is a letter from the Secretary of State's office, dated December 8, 1999, on file at the Secretary of State's office, addressed to Yanette Maldonado, the registered agent for JG–24, at her address as listed in the incorporation papers, which states that JG–24 has failed to file more than two years of annual reports and that if such annual reports are not filed within 60 days, JG–24 will be canceled. No annual reports were filed after the date of this letter. (Stipulated Fact Nos. 220, 221; Plaintiff Exh. 184; Reinaldo Cestero Direct testimony)

27. There is a certificate from the Secretary of States's office of Puerto Rico stating that JG–24, Inc.'s corporate status was cancelled on February 8, 2000. (Reinaldo Cestero Direct testimony; Plaintiff Exh. 236)

 d. *Jorge Ortiz is the Proprietor and Person in Control of JG–24*

28. Defendant Jorge Ortíz has represented himself to be the "President" of JG–24. (Answer, ¶ 9), in excerpt of Answer to initial Complaint (admitted into evidence through grant of Motion Designating Deposition Excerpts")

29. Jorge Ortiz decided what products were to be manufactured at the JG–24 facility. (Alberto Mendez Deposition excerpt, p. 33, lines 15–17)

30. The JG–24 workers took directions from Jorge Ortiz, and there were no other supervisors who gave work instructions at the JG–24 facility other than Jorge Ortiz. (Alberto Mendez Deposition excerpt, p. 22, lines 22–25 through p. 23, lines 1–7)

31. Jorge Ortiz hired workers for JG–24. For instance, Jorge Ortiz hired Alberto Mendez and Carmelo Mejia. Carmelo Mejia worked at the J & G Site, making fiberglass tanks and swimming pools, starting in 1997 or 1998. Carmelo Mejia continues to work for Jorge Ortiz. He works on construction projects along with Alberto Mendez. (Stipulated Fact Nos. 109–111, 118–121)

32. Efrain Vazquez worked for Jorge Ortiz at the J & G Site between approximately 1990 and 2000. Efrain Vazquez continues to work for Jorge Ortiz in construction and did such work in 2000–2003. Efrain Vazquez understood Jorge Ortiz to be the person in charge of JG–24. (Stipulated Fact Nos. 115, 116, 117)

33. There is a bank account in the BBVA with account number 061–1110005698 in the name of J & G 24 Corp. This account was 061–6194–206 when it was opened. It was opened with Royal Bank of Puerto Rico. BBVA is the successor of Royal Bank de Puerto Rico. (Stipulated Fact No. 216)

34. The card on file with BBVA stating the names of the holders of the BBVA account with the title of J & G 24 Corp. list two holders. One holder is listed as J & G 24 Corp. The other holder is listed as Jorge Ortiz Romany. (Stipulated Fact No. 217)

35. Jorge Ortiz Romany is the only individual authorized to control BBVA account number 061–1110005698. Although the account is in the name of J & G 24 Corp., it is a joint or commingled account of the two holders. (Plaintiff Exhs. 144, 147, 148)

36. BBVA produced checks written on this account of $1,000 or more in 2001–2003. All of the checks produced are signed by Jorge J. Ortiz. (Stipulated Fact No. 218; Plaintiff Exhs. 154, 157)

37. Defendant Jorge Ortiz is the proprietor of JG–24, which is no longer a corporation.

38. When JG–24 had corporate status, Jorge Ortiz was the alter ego of that corporation, which was not operated as a corporation.

 2. ***Distribuidora K–Aribe /D.T. Karibe, Inc.***

 a. *Incorporation*

39. The Secretary of State's office has a record of a company called D.T. Karibe, Inc. (Stipulated Fact No. 192)

40. The incorporation papers for D.T. Karibe, Inc., were signed in 1992 by Carlos Capre Martinez, Frank Hi-

chez, and Pedro Santiago Andino. (Stipulated Fact No. 193)

41. Carlos Capre Martinez was employed up to 1994 with different enterprises related to Jorge Ortiz. Carlos Capre Martinez was a salesman at the Cataño property until 1994. (Stipulated Fact Nos. 194, 196)

42. Jorge Ortiz asked Carlos Capre Martinez to sign the incorporation papers for D.T. Karibe, Inc. (Stipulated Fact No. 195)

43. When Carlos Capre Martinez worked at the Cataño property, Frank Hichez did handyman and mechanic work at the Cataño property. (Stipulated Fact No. 197)

### b. *Distribuidora K–Aribe Has Not Been Operated As a Corporation*

44. No stocks were ever issued by Distribuidora K–Aribe (D.T.Karibe, Inc.), and Distribuidora K–Aribe does not have stockholders or stockholders' meetings. (Stipulated Fact Nos. 198, 242).

45. Distribuidora K–Aribe (D.T.Karibe, Inc.) never issued bylaws. (Stipulated Fact No. 199)

46. No documents, including but not limited to minutes, concerning meetings of the board of directors and/or meeting of the shareholders of Distribuidora K–Aribe at any times between the time of incorporation and the present exist. (Stipulated Fact No. 200)

47. Distribuidora K–Aribe does not have any Board of Directors or officers, such as a president or a secretary. (Stipulated Fact No. 224, 243)

48. There is no record of any annual reports (filed by corporations) having been filed by D.T. Karibe, Inc. with the office of the Secretary of State of Puerto Rico. (Stipulated Fact No. 201)

49. There is no record of any annual fees required to be paid by corporations having been paid by D.T. Karibe Inc. to the office of the Secretary of State of Puerto Rico. (Stipulated Fact No. 202)

50. No annual (or other periodic) reports of Distribuidora K–Aribe (D.T.Karibe, Inc.) exist for any times between 1990 and the present. (Stipulated Fact No. 203)

### c. *Distribuidora K–Aribe/D.T. Karibe's Corporate Status Expired*

51. D. T. Karibe's (Distribuidora K–Aribe's) 1992 incorporation papers provide that D.T. Karibe was incorporated for a period of two years. There are no certificates of renewal on file at the Puerto Rico Secretary of State's office of D.T. Karibe as a corporation. (Reinaldo Cestero Direct testimony; Plaintiff Exh. 224, p. 2, Article 6; 14 L.P.R.A. § 3102 (temporary corporations expire at the end of their term unless certificate of renewal is filed with the office of the Secretary of State prior to the end of the term and other conditions are met))

### d. *Distribuidora K–Aribe is a Proprietorship and Jorge Ortiz is the Proprietor*

52. Jorge Ortiz has been dealing with the operation at the Cataño facility since 1986 (more or less). (Plaintiff Exh. 176, p. 5; Francisco Claudio Direct testimony)

53. On December 3, 1997, EPA inspectors Francisco Claudio Rios and Eduardo Gonzalez visited the Cataño facility. There were two ladies who appeared to be sales persons who identified themselves as Gloria Alvarez and Rodes [Rothes] Gonzalez. On December 3, 1997, Rodes [Rothes]

Gonzalez told the EPA inspectors that "Joaquin Román" was the manager and was in charge and that he will answer any question. (Francisco Claudio Direct testimony, Plaintiff Exh. 121)

54. Jorge Ortiz visited the Distribuidora K–Aribe facility periodically. When Jorge Ortiz visited the facility he used one of the offices. (Betzaida ("Betsy") Ortiz Direct testimony; Stipulated Fact No. 133)

55. Jorge Ortiz has been involved with purchasing products that are to be sold at Distribuidora K–Aribe. (Stipulated Fact No. 132)

56. Jorge Ortiz has interviewed people seeking jobs with Distribuidora K–Aribe. Jorge Ortiz has offered employment to people seeking jobs at Distribuidora K–Aribe. (Betsy Ortiz Direct testimony)

57. Jorge Ortiz supervised Betsy Ortiz. He supervised all the employees at Distribuidora K–Aribe. If Jorge Ortiz asked employees at Distribuidora K–Aribe to do something, they followed his directions. (Betsy Ortiz Direct testimony)

58. Distribuidora K–Aribe employees were paid by check. Jorge Ortiz signed the pay checks for the Distribuidora K–Aribe employees. (Stipulated Fact No. 134; Betsy Ortiz Direct testimony)

59. Sometimes Distribuidora K–Aribe had to return money to a customer or client, if the client returned something he purchased. When Distribuidora K–Aribe paid the money back for returned items with a check, the check was signed by Jorge Ortiz. (Stipulated Fact No. 137; Betsy Ortiz Direct testimony; Plaintiff Exh. 98)

60. Betsy Ortiz, an employee at the Cataño facility for over five years, says that Jorge Ortiz is the manager in overall control of Distribuidora K–Aribe. (Stipulation No. 236; Betsy Ortiz Direct testimony)

61. Distribuidora K–Aribe uses a checking account in the Banco Bilbao Vizcaya ("BBVA") number 061–1060007300. (Stipulated Fact No. 135)

62. Jorge Ortiz is entitled to write checks and withdraw money from the Account of Dtstribuidora K–Aribe at the Banco Bilbao Vizcaya. (Stipulated Fact No. 227)

63. Jorge Ortiz signs the checks to pay the invoices for materials purchased by Distribuidora K–Aribe. (Stipulated Fact No. 136)

64. On occasion, Jorge Ortiz receives checks made out to him personally. Sometimes the checks made out to Jorge Ortiz personally were deposited into the Distribuidora K–Aribe account. (Stipulated Fact Nos. 138, 139; Plaintiff Exh. 100).

65. Jorge Ortiz has the authority to withdraw money from Distribuidora K–Aribe bank accounts. (Stipulated Fact No. 140)

66. The signature card for BBVA account number 061–1060007300 says that the title of the account is DT Karibe. (Stipulated Fact No. 204)

67. There are two holders listed on the signature card for BBVA account number 061–1060007300. One holder is listed as DT Karibe. The other holder is listed as Jorge Ortiz Romany. (Stipulated Fact No. 205)

68. Jorge Ortiz Romany is the only individual named as authorized to control BBVA account number 061–1060007300. Although the account is in the name of DT Karibe, it is a joint or commingled account of the two holders. (Plaintiff Exh. 148)

69. Jorge J. Ortiz signs checks on the DT Karibe BBVA account number 061–1060007300. (Stipulated Fact No. 206)

70. Jorge J. Ortiz made payments to an attorney, Benjamin Ortiz, in July 2000 and on other dates, through checks issued on the account of DT Karibe BBVA account 061–1060007300. (Stipulated Fact No. 207; Plaintiff Exh. 155, *e.g.* pp. BBV 0219, BBV 0455)

71. Checks made out to Jorge Ortiz have been deposited into the Distribuidora K–Aribe account (DT Karibe BBVA account number 061–1060007300). (Stipulated Fact No. 208)

72. Jorge J. Ortiz signs checks for condominium fees for his companion Gloria Alvarez Nieves' apartment issued on the account of DT Karibe BBV account 061–1060007300. (Plaintiff Exh. 158, *e.g.*, p. BBV 1114)

73. BBVA produced checks of $1,000 or over on DT Karibe account number 061–1060007300 in 2001–2003. These checks are all signed by Jorge J. Ortiz. (Stipulated Fact No. 209; Plaintiff Exhs. 155, 158).

74. Defendant Jorge Ortiz is the proprietor of Distribuidora K–Aribe, which is no longer a corporation.

### 3. *Fiberglass Dura Mas/Dura Mas*

#### a. *Incorporation*

75. There are no incorporation papers for Fiberglass Dura Mas available at the Secretary of State's Office. (Stipulated Fact No. 178)

76. Banco Popular has a copy of the incorporation papers for Fiberglass Dura Mas on file. (Stipulated Fact No. 176; Plaintiff Exh. 140)

77. The incorporation papers for Fiberglass Dura Mas, Inc. on file with Banco Popular indicate that it was in-corporated in 1976 by three incorporators. Jorge J. Ortiz was one of the incorporators and owned 13 out of the 15 shares of stock. (Plaintiff Exh. 140, p. 2; Stipulated Fact No. 177)

78. The incorporation papers for Fiberglass Dura Mas on file with Banco Popular indicate that it was originally incorporated under a different name, which is scratched out and changed in handwriting to Fiberglass Dura Mas. with the handwritten change made by Jorge J. Ortiz. (Plaintiff Exh. 140, p. 1 (original Spanish version))

#### b. *Fiberglass Dura Mas Has Not Been Operated As a Corporation*

79. Fiberglass Dura Mas, Inc., has not filed annual reports with the Secretary of State of Puerto Rico that are required of corporations. (Stipulated Fact No. 179)

80. Fiberglass Dura Mas, Inc, has not paid annual fees to the Secretary of State of Puerto Rico that are required of corporations. (Stipulated Fact No. 180)

81. There are no annual (or other periodic) reports of Fiberglass Dura Mas, Inc. and/or Dura Mas. (Stipulated Fact No. 181)

82. Fiberglass Dura Mas does not have any bylaws. (Stipulated Fact No. 182)

83. There are no documents, including but not limited to minutes, concerning meetings of the board of directors and/or shareholders of Fiberglass Dura Mas, Inc., and/or Dura Mas at any times between the time of incorporation and the present available. (Stipulated Fact No. 183)

84. Fiberglass Dura Mas, Inc, does not currently have directors or board of directors, has not had a board of di-

rectors for many years, has not held board of director meetings for many years, and has not prepared minutes of board of directors meetings ever. (Stipulated Fact No. 184)

85. There are no financial statements, including but not limited to balance sheets, income statements, and/or profit and loss statements, of Fiberglass Dura Mas at any times between 1990 and the present. (Stipulated Fact No. 185)

86. There are no income tax returns, including but not limited to Puerto Rico income tax returns, filed on behalf of Fiberglass Dura Mas, Inc., and/or Dura Mas between 1990 and the present. (Stipulated Fact No. 186)

87. Fiberglass Dura Mas, Inc. does not currently have any shareholders. (Stipulated Fact No. 191)

c. *Fiberglass Dura Mas Is Not a Corporation*

88. Dura Mas, or Fiberglass Dura Mas, does not exist as a corporation. (Stipulated Fact No. 189)

d. *Fiberglass Dura Mas is a Proprietorship and Jorge Ortiz is the Proprietor*

89. In the Puerto Rico Telephone/Verizon Area Metro 2002–2003 and 2003–2004 telephone books, white pages, commercial section, there is a listing under the name of "Dura Mas Tanques/Fiberglass" at the address of the Cataño facility. There is no listing of Distribuidora K–Aribe. (Plaintiff Exh. 127; Reinaldo Cestero Direct testimony; judicial notice)

90. In the Puerto Rico Telephone/Verizon Area Metro 2002–2003 and 2003–2004 telephone book, yellow pages, there is a listing under the heading of Fiberglass/Products of the name "Dura Mas" at the address of the Cataño facility. There is no listing of Distribuidora K–Aribe. (Plaintiff Exh. 127; Reinaldo Cestero Direct testimony; judicial notice)

91. Customers write checks to Dura Mas. (Jorge Ortiz Deposition Excerpt, Deposition, Exhibit 15, p. 2, third check (admitted into evidence by grant of the Motion Designating Deposition Excerpts); Stipulated Fact No. 237)

92. Invoices for equipment and materials purchased are sometimes addressed to Dura Mas Fiberglass. (Plaintiff Exh. 88 (last twelve pages, invoices from Land 'n' Sea Distributing, Inc., year 2003); Betsy Ortiz Direct Testimony)

93. Dura Mas received an invoice for seminar materials Jorge Ortiz ordered in April 2000. (Plaintiff Exh. 108)

94. There is a bank account number 170–001555 in the Banco Popular of Puerto Rico, Levittown branch, under the name Dura Fiberglass Dura Mas. (Stipulated Fact No. 164)

95. The authorized signature card on file for Banco Popular 170–001555 account has one signature, that of Jorge J. Ortiz. (Stipulated Fact No. 165; Plaintiff Exh. 136)

96. The agreement under which Banco Popular 170–001555 account is opened is signed on June 12, 1986 by Jorge J. Ortiz, and Jorge J. Ortiz has been authorized to sign checks on that account since 1986. (Plaintiff Exh. 137; Stipulated Fact No. 168)

97. Banco Popular has on file a certificate of resolution by Fiberglass Dura Mas, dated in Cataño, Puerto Rico, in 1986 authorizing only the signatory Jorge J. Ortiz to access the Fiberglass Dura Mas account. (Stipulated Fact No. 166; Plaintiff Exh. 138)

98. The certificate of resolution by Fiberglass Dura Mas, dated in Cataño, Puerto Rico, in 1986, on file with Banco Popular, authorizing only Jorge J. Ortiz to sign checks for Fiberglass Dura Mas, is signed by Gloria Alvarez, "Secretary" and Jorge J. Ortiz, "Presidente." (Plaintiff Exh. 138 (original Spanish version), p. 2)

99. The certificate of resolution is on behalf of Fiberglass Dura Mas, and the address given of Fiberglass Dura Mas at time of the certificate of resolution is Diez de Andino 111, Santurce, Puerto Rico. (Stipulated Fact No. 167; Plaintiff Exh. 138)

100. The certificate of resolution is stamped with the stamp of the previous name of the company, Fiberglass de Puerto Rico. (Plaintiff Exh. 138 (original Spanish version), p. 2)

101. As of 1986, Jorge J. Ortiz was authorized to sign checks for Fiberglass Dura Mas on Banco Popular account 170–001555. (Stipulated Fact No. 168)

102. All the checks from 2001–2003 produced by Banco Popular re account 170–001555 are signed by Jorge J. Ortiz. (Stipulated Fact No. 169; Plaintiff Exh. 142)

103. The periodic bank statements for account 170–001555 are addressed to Dura Fiberglass Dura Mas at 111 Calle Diez de Andino, San Juan, PR. (Plaintiff Exh. 142, e.g. p. BP 0019)

104. Jorge J. Ortiz signs checks for Fiberglass Dura Mas. (Stipulated Fact Nos. 170, 171; Distribuidora K–Aribe 30(b)(6) Deposition excerpt (admitted into evidence by the grant of the Motion Designating Deposition excerpts), pp. 76–77 and attached Deposition Exhibit 11)

105. Jorge J. Ortiz signs checks for "cash" on checks issued on the account of Fiberglass Dura Mas. (Stip-ulated Fact No. 172; Plaintiff Exh. 142, e.g. p. BP 0230)

106. Jorge J. Ortiz has made payments to an attorney, Benjamin Ortiz, for Attorney Ortiz' representation of Jorge J. Ortiz in this litigation, through checks issued on the account of Fiberglass Dura Mas and signed by Jorge J. Ortiz. (Stipulated Fact No. 173; Plaintiff Exh. 142, e.g. p. BP 0156)

107. Jorge J. Ortiz has made payment to Yoruba Figueroa for repairs to Jorge Ortiz's traxcavator that was used at the J & G Site through check(s) issued on the account of Fiberglass Dura Mas and signed by Jorge J. Ortiz. (Stipulated Fact No. 174)

108. Jorge Ortiz wrote Yoruba Figueroa a check for $3,500.00 on the Dura Fiberglass Dura Mas Marketing Industries Account lending Figueroa the money for the purchase of a car for himself. (Stipulated Fact No. 175)

109. Jorge J. Ortiz signed checks for payment to Distribuidora K-aribe on checks issued on the account of Fiberglass Dura Mas. (Plaintiff Exh. 142; e.g., p. BP 0251)

110. Jorge J. Ortiz signed checks for payment to JG–24 on checks issued on the account of Fiberglass Dura Mas. (Plaintiff Exh. 142; e.g. p. BP 0250)

111. Fiberglass Dura Mas, Inc. a/k/a Dura Mas or Duramas does not have employees. (Stipulated Fact No. 187)

112. Credit card transactions for purchases by customers of Distribuidora K–Aribe or Dura Mas at the Cataño facility are processed through an account in the name of Dura Mas or Dura Mas Fiberglass, which is

assigned the Merchant Account # 231068. (Plaintiff Exhs. 94, 95, 135, 205, 208, 210, 213, 214; Stipulated Fact No. 146)

113. GM Group, Inc. handles credit card transactions involving customer purchases using credit cards at the Cataño facility utilizing Merchant Account # 231068. (Plaintiff Exh. 135)

114. Credit card sales drafts of merchant account number 231068 are deposited into Banco Popular checking account number 170–001555 which has the name Dura Mas Fiberglass or Dura Fiberglass Dura Mas, to which Jorge J. Ortiz is the sole signatory. Plaintiff Exh. 94, 95, 135, 205, 208, 210, 213, 214; Stipulated Fact No. 14.

115. The credit card impression machine used by Distribuidora K–Aribe (and by Dura Mas) a the Cataño facility impressed the name "Dura Mas" on credit card transaction forms. (Plaintiff Exh. 95)

116. Documents on file with GM Group, Inc. show that the credit card arrangement for Merchant Account # 231068 was initiated with Fiberglass Dura Mas, and that the person representing Fiberglass Dura Mas was a Jorge Ortiz Romany who had an address at 111 Diez de Andino Street, San Juan, PR, and a Social Security Number of 583–01–2227. (Plaintiff Exh. 205, 208, 210, 213, 214)

117. Periodic statements on file with GM Group, Inc. include Merchant Statements for Merchant Account # 231068, which is associated with Banco Popular Account # 170–001555. These statements are addressed to Distribuidora Caribe, P.O.Box 475, Cataño, PR 00963. (Plaintiff Exh. 222)

118. Periodic statements on file with the GM Group, Inc. also include statements associated with account # 170–001555, which are addressed to Dura Fiberglass Dura Mas Marketing Industries, 111 Calle Diez de Andino, San Juan, PR 00911–2118. (Plaintiff Exh. 223)

119. Jorge Ortiz continues to conduct business as Fiberglass Dura Mas or Dura Mas, including transactions with suppliers, advertisements in the phone book, sales of products, credit card transactions, and checking account transactions. Fiberglass Dura Mas is a proprietorship, and Jorge Ortiz is the proprietor of Fiberglass Dura Mas. Since there are no employees of Dura Mas, Jorge Ortiz is the sole operator of Dura Mas. Since he is the only person authorized to sign checks on the Dura Mas account, he is the sole beneficiary of Dura Mas.

### 4. *Jorge Ortiz' Companies are Commingled and Linked*

120. Dura Mas is a trade name for some of the products of Distribuidora K–Aribe. (Stipulated Fact No. 141)

121. When invoices are received for products that Distribuidora K–Aribe buys, the invoices are sometimes addressed to Distribuidora K–Aribe. (Stipulated Fact No. 142)

122. When invoices are received for products that Distribuidora K–Aribe buys, the invoices are sometimes addressed to Dura Mas. (Stipulated Fact No. 143)

123. Sometimes checks that are made out to Dura Mas by customers are deposited into the Distribuidora K–Aribe checking account. (Stipulated Fact No. 237; Plaintiff Exh. 97)

124. Customer credit card transactions at the Cataño facility, including those of Distribuidora K–Aribe, are processed through a credit card machine that uses the name "Dura Mas," and the proceeds thereof are deposited into the Dura Fiberglass Dura Mas bank account. (Stipulated Fact Nos. 144–147)

125. At the direction of Jorge Ortiz, fiberglass products manufactured at JG–24 were taken to Distribuidora Karibe. (Alberto Mendez Deposition excerpt, p. 12, lines 20–25 through p. 13, lines 1–9)

126. Supplies and materials used in the fiberglass manufacturing process at JG, such as resin, gelcoat, acetone and MEK Peroxide were supplied to JG–24 by Distribuidora Karibe. (Alberto Mendez Deposition excerpt, p. 68, lines 20–25 through p. 69, lines 1–4)

127. Alberto Mendez would bring about five or six drums of resin to the J & G Site weekly. (Stipulated Fact No. 113)

128. At the request and direction of Jorge Ortiz, Alberto Mendez went to the J & G Site several times during the period of the EPA removal action to get fiberglass product molds and took them to the Cataño facility. (Alberto Mendez Deposition excerpt, p. 83, lines 16–23)

## E. Facts Relating to United States' Claims re J & G Site

### 1. Ownership of the J & G Site

129. Defendant Jorge Ortiz is a current owner of the J & G Site and has been an owner of that real property since 1988. Defendant Jorge Ortiz has been the owner, along with Gloria Alvarez Nieves, who is described in the recorded deed as his wife, since 1988. (Stipulated Fact No. 234; Plaintiff Exhs. 75 and 76)

### 2. December 3, 1997 Inspection—J & G Site [6]

130. On December 3, 1997, EPA inspectors Francisco Claudio Rios and Eduardo Gonzalez visited the J & G Site to conduct a preliminary inspection. During the December 3, 1997 inspection at the J & G Site, EPA inspector Francisco Claudio Rios spoke with various employees at the Site to obtain preliminary information about the J & G Site operations and ownership. None of the employees was willing to provide information as to the person in charge. (Francisco Claudio Direct testimony; Plaintiff Exh. 185)

131. During the December 3, 1997 inspection at the J & G Site, EPA inspectors observed:

a. Many 55–gallon drums haphazardly stored throughout the J & G Site and dumped into areas of vegetation at the periphery of the property. Many of the drums were in severely deteriorated condition including being rusted, corroded, dented, collapsed, bulged, inflated, and/or leaking and stained. Some of these drums were labeled "Acetone" and "Resin Solution." Many of these deteriorated drums were exposed to the elements.

b. Many 55–gallon drums dumped into or near two sinkholes at the Site. The drums dumped into one sinkhole were in various stages of deterioration including being rusted, severely corroded, dented, collapsed, bulged

6. Exhibits A to G attached hereto are a sampling of numerous photographs taken at the site which were admitted as evidence. [Editor's Note: Exhibits A through G could not be reproduced for publication.]

and/or leaking and stained. Some of these drums were labeled "Acetone" or "Resin Solution." Approximately 10 drums were in close proximity (about 10 meters) to the other sinkhole at the Site.

c. Several areas of dark stained soils at the Site, including areas of staining near or next to deteriorated, leaking or stained drums, some of which were labeled "Acetone" or "Resin Solution." Stained soils were also observed in the areas of the manufacturing operations.

d. Workers applying fiberglass materials in an open structure.

e. An electrical box at the Site located in a wood and aluminum structure surrounding pig houses where several feed bags were stored.

(Francisco Claudio Direct testimony; Eduardo Gonzalez Direct testimony; Plaintiff Exhs. 185, 189 (including photo captions))

132. During the December 3, 1997 inspection, the EPA inspectors also identified a strong odor of solvents. (Francisco Claudio Direct testimony; Eduardo Gonzalez Direct testimony; Plaintiff's Exh. 185)

133. EPA inspector Eduardo Gonzalez testified that he saw drums with flammable material labels. Some of the drums were bulging, as a result of expansion of volatile organic substances within being left out in the heat. He handled the drums carefully because a spark might cause an explosion. (Eduardo Gonzalez Direct testimony)

134. EPA inspector Francisco Claudio testified that he thought the electrical wiring presented a hazard because it was haphazard, there were vapors, and the ventilation was poor. (Francisco Claudio Direct testimony; see also Eduardo Gonzalez Direct testimony; Plaintiff Exh. 189, p. 189–23 (photo 45 caption))

135. The EPA inspectors observed that there were no safety notices and no safety equipment, such as fire extinguishers. (Francisco Claudio Direct testimony)

136. EPA inspector Eduardo Gonzalez talked to some of the workers and asked it they knew they were working with hazardous chemicals and they were very surprised at what he was telling them. They had no training, no knowledge about the hazards. They did not have any protection equipment or clothes to deal with the hazards; they were just operating with their bare hands and no air respirators. (Eduardo Gonzalez Direct testimony)

### 3. *February 1998 Initial Sampling and Inspection*

137. Between the December 3, 1997 inspection and January 28, 1998, EPA made various attempts to obtain voluntary access to the J & G Site to undertake sampling and further inspection activities. These efforts were unsuccessful. (Plaintiff Exh. 12, ¶¶ 10–19; Stipulated Fact Nos. 15, 16)

138. On January 28, 1998, the United States sought and received an *Ex Parte* Warrant for Entry for the purposes of conducting an inventory of the hazardous substances stored at the J & G Site and sampling activities thereon, which was executed during the week of February 3, 1998. (Plaintiff Exh. 12, ¶¶ 19–20; Francisco Claudio Direct testimony)

139. EPA inspected the J & G Site during the week of February 3, 1998, and took samples of soils, surface water, and wastes at the Site. EPA also conducted an inventory of con-

tainers that were visible at the manufacturing area at the J & G Site in February 1998, which included some partially buried drums, as well as surficial drums and containers. Some of the drums and containers inventoried were empty; others were not empty. Stained soils were also observed. (Plaintiff Exh. 6, pp. 5–6; Stipulated Fact No. 17)

140. The analytical results of the February 1998 samples contained in a report dated March 12, 1998, regarding the Site Assessment at the J & G Site, showed that some samples taken at the J & G Site contained hazardous substances, including styrene and acetone. (Plaintiff Exh. 6, pp. 6–7)

141. During the February 1998 inspection, EPA inspectors also observed that the Site had no storm water runoff control, causing storm water to flow through waste piles where it would leach out and ultimately flow into sinkhole areas that are a groundwater recharge area. (Plaintiff Exh. 7,[7] p. 5)

142. As a result of the February 1998 inspection, EPA determined that additional sampling and investigation activities at the J & G Site were necessary to assess the extent of the contamination at the Site and to determine whether a removal action under CERCLA would be required. (Plaintiff Exh. 7, p. 6)

### 4. *Access*

143. After the February 1998 inspection, EPA again made efforts to obtain voluntary access to the J & G site for investigation and sampling activities. These efforts included returning to the J & G Site to seek

entry and making numerous phone calls and leaving phone messages for Jorge Ortiz which were not returned. Such efforts were made on various dates, including in June of 1998 and October of 1998. (Plaintiff Exh. 12,[8] ¶¶ 24–27)

144. For instance, EPA On Scene Coordinator Michael Ferriola and other EPA representatives and contractors attempted to visit the J & G Site in late June 1998. The iron gate across the entrance road was locked at the time of EPA arrival. After about 15 minutes, a JG employee was found leaving the Site, and EPA asked him for permission to enter. He denied access and locked the gate upon departure. A second employee, working on a barbed wire fence, was also asked for permission to enter. He stated that he would ask the person in charge for permission to admit them. They waited another 15–20 minutes, but he did not return. OSC Michael Ferriola and other EPA representatives also attempted to visit the J & G Site in October 1998, but once again the gate was locked. (Michael Ferriola Direct testimony, Francisco Claudio Direct testimony; Plaintiff Exh. 8)

145. Following these efforts, EPA issued an Administrative Order Directing Compliance With Request For Access to JG–24, directing JG–24 to comply with EPA's request for access. The Administrative Order avers that Jorge Ortiz is the president, owner and/or manager of JG–24. The Administrative Order was sent by certified mail, with a transmittal letter of February 23, 1999, addressed to Mr. Jorge Ortiz (or) Man-

---

7. Plaintiff Exh. 7 is also in the Administrative Record, Plaintiff Exh. 134, at tab 1.

8. Plaintiff Exh. 12 is also in the Administrative Record, Plaintiff Exh. 134, at tab 24.

ager (or) President, J & G 24 Corporation, at both the J & G Site and the Cataño facility. While the address for the J & G Site was incorrect insofar as it referred to Vega Baja instead of Vega Alta, the address for the Cataño facility was correct. (Stipulated Fact No. 18; Plaintiff Exhs. 12, 72)

146. On March 3, 1999 EPA inspector Francisco Claudio Rios hand delivered the Administrative Order Directing Compliance With Request for Access, with the February 23, 1999 transmittal letter, to Rodes [Rothes] Gonzalez, an employee at the Cataño facility, who signed for the letter. (Francisco Claudio Direct testimony; Plaintiff Exhibits 12, 72, 73; Stipulated Fact No. 13)

147. On March 11, 1999, copies of the Administrative Order were also left at the front gate to the J & G Site and inserted into an open window at Jorge Ortiz' residence in Santurce, Puerto Rico. (Francisco Claudio Direct testimony; Plaintiff Exhibits 12, 72, 74)

148. JG–24 failed to comply with, or even respond to, EPA's Administrative Order Directing Compliance With Request For Access. (Francisco Claudio Direct testimony)

149. The Administrative Order became effective on March 11, six (6) business days after it was received and signed for by Jorge Ortiz' employee Rodes Gonzalez at the Cataño facility. (Plaintiff Exh. 12, p. 9)

150. Since EPA did not obtain access through the Administrative Order, the United States sought and obtained an access warrant from the United States District Court for additional sampling and investigation activities, which was sought on April 13, 1999 and executed with the assistance of the Marshal's Service on April 14, 1999. (Plaintiff Exh. 14, p. 1; Stipulated Fact No. 20; Michael Ferriola Direct testimony)

151. There were 34 days of noncompliance with the Administrative Order between its effective date, March 11, 1999, and the date EPA was able to access the J & G Site for the additional sampling and investigation activities on April 14, 1999.

152. Obtaining access without delay was important for EPA to be able to ascertain whether there was a release or threat of release of hazardous substances that would impact public health or the environment. (Michael Ferriola Direct testimony)

### 5. *April 1999 Sampling Investigation*

153. Pursuant to the second warrant for access to the J & G Site, which was executed between April 14 and April 17, 1999, EPA conducted additional drum, soil, and water sampling at the J & G Site. (Stipulated Fact No. 21)

### a. *Site Conditions*

154. There were several structures at the J & G Site in the area where the fiberglass products were manufactured, some of them roofed and all of them open to the environment on the sides. Some of the structures in the manufacturing area, including open air sheds, were in poor condition, with roof pieces falling down. (Michael Ferriola Direct testimony; Plaintiff Exh. 13 [9], p. 7; Plaintiff

---

9. The text and some appendices of Plaintiff Exh. 13 is also in the Administrative Record, Plaintiff Exh. 134, at tab 8.

Exh. 14 (also contained in the Administrative Record, Plaintiff Exh. 134, at tab 2), pp. 2,3; Plaintiff Exh. 191, including pp. 191–3, –4, –5, –48)

155. Raw material drums, including those with hazardous labels, were haphazardly stored. Deteriorated used drums, many leaking, were stored or disposed of in piles or lying on their side. (Plaintiff Exh. 14, p. 4, Plaintiff Exh. 191, Plaintiff Exh. 15,[10] p. 2)

156. There was one section of the pole barn sheds in the manufacturing area at the Site that had previously been in a fire, as evidenced by charred material on the roof. (Michael Ferriola Direct testimony; Plaintiff Exh. 15, p. 2)

b. *Site Practices*

157. During the April 1999 EPA investigation and sampling activities, JG–24 employees were using the Site to produce fiberglass products such as swimming pools, water tanks, boats, and carriages. (Stipulated Fact No. 22)

158. During manufacturing of fiberglass products, the workers were spraying styrene resins onto the fiberglass. JG–24 employees would punch holes in drums of resin to put the hoses to the sprayers in. The employees would cut into the drum instead of using the bungholes that came with the drum. (Michael Mercado Direct testimony; Michael Ferriola Direct testimony)

159. EPA employee Michael Mercado observed workers in April 1999, spraying a blue-colored spray inside of the pools being manufactured at the site without protective equipment (Michael Mercado Direct testimony)

160. Employees of JG–24 sometimes did not use protective gear, like face masks, when performing fiberglass manufacturing work because they did not like to use them. (Alberto Mendez Deposition excerpt, p. 142, lines 2–18)

c. *Chemicals Used*

161. During the April 1999 EPA investigation and sampling activities, JG–24 was using acetone, styrene resins, and methyl ethyl ketone (MEK) peroxide in its operations in the manufacturing area at the J & G Site. The MEK peroxide was a Cook Composites and Polymers product that came in a solution of dimethyl phthalate. (Plaintiff Exh. 13, pp. 1, 49; Plaintiff Exh. 191, pp. 191–16, –28, –29, –36, –50, Plaintiff Exh. 14, p. 2; Plaintiff Exh. 33, item 33–BO12, p. 1; Michael Ferriola Direct testimony).

162. EPA consulted Material Safety Data Sheets ("MSDSs") and National Institute for Occupational Safety and Health ("NIOSH") information sheets to determine what kinds of hazards were associated with the materials JG–24 was using in its fiberglass product manufacturing operations, *e.g.*, acetone, styrene resins, and MEK peroxide. (Michael Ferriola Direct testimony; Plaintiff Exhs. 23–29, 31–32)

163. In addition to the MSDSs reviewed by EPA in April 1999, MSDSs later produced by Defendants' former employee Betsy Ortiz and Defendants' expert witness Neftali García also provide information on the hazards associated with acetone, styrene resins, and MEK peroxide solutions. The MSDSs indicate that the materials pose a fire or explosion hazard,

10. Plaintiff Exh. 15 is also in the Administrative Record, Plaintiff Exh. 134, at tab 15.

as well as an environmental hazard. (Plaintiff Exhs. 33, 34)

164. The Material Safety Data Sheet for acetone says that acetone is "Extremely Flammable. Vapors are heavier than air. Vapors may travel across the ground and reach remote ignition sources causing a flashback fire danger." (Plaintiff Exh. 33, item 33–BO9, p. 1)

165. The Material Safety Data Sheet for MEK peroxide solution says "Keep containers tightly closed and isolate from heat, electrical equipment, sparks and flame. Never use welding or cutting torch on or near drum (even empty) because product (even just residue) can ignite explosively." (Plaintiff Exh. 33, item 33–BO12, p. 3)

166. The Material Safety Data Sheet for the Polyester Resin Solution in Styrene "17" says "Flammable in the presence of open flames, sparks, or heat. Can react with oxidizing materials. Explosive in the form of vapor when exposed to heat or flame." (Plaintiff Exh. 33, item 33–BO16, p. 2)

 d. *Releases and Threatened Releases*

167. During the April 1999 EPA investigation and sampling activities, EPA observed that there were hundreds of used drums at the Site in various states of deterioration scattered throughout the Site, many of which were lying on their sides. Some of them had waste materials leaking onto the ground. Many of these drums were open, rusted, crushed, or otherwise not in good condition. Many had holes punched in them. Each of the drum samples were taken from such waste drums. (Michael Ferriola Direct testimony;

Plaintiff Exh. 191 (photos); Plaintiff Exh. 13, pp. 2–8, 24–30; Plaintiff Exh. 14, p. 6; Plaintiff Exh. 17,[11] p. 1)

168. The drums with waste materials in them were not marked with the date on which each had begun being stored or accumulated at the J & G Site. (Michael Ferriola Direct testimony)

169. In April 1999, EPA also observed stained soils at various locations at the J & G Site, and several of the soil samples were taken at those locations. (Plaintiff Exh. 13, pp. 31–38; Plaintiff Exh. 14, p. 4)

170. There is a sinkhole at the manufacturing area at the J & G Site that is located in the northeastern part of the manufacturing area. The sinkhole located in the northeastern part of the manufacturing area is about 40 feet deep. (Stipulated Facts No. 12, 23; Mike Ferriola Direct testimony)

171. In April 1999, there were many drums that had been pushed into the main sinkhole. The drums were piled haphazardly on top of each other and resembled a wall of drums. (Mike Ferriola Direct testimony; Plaintiff Exh. 191 (photos), pp. 191–11, –12)

172. There were no erosion or stormwater management controls in the manufacturing area. Storm water runoff would flow through waste piles and transport waste material on the ground into the sinkhole. Sinkholes are groundwater recharge areas. (Plaintiff Exh. 13, p. 1; Plaintiff Exh. 14, p. 3; Plaintiff Exh. 15 (also contained in the Administrative Record, Plaintiff Exh. 134, at

**11.** Plaintiff Exh. 17 is also in the Administrative Record, Plaintiff Exh. 134, at tab 6.

tab 15), pp. 3,4; Mike Ferriola Direct testimony)

173. During the April 1999 EPA investigation and sampling activities, there were strong chemical odors of solvents and resins at the J & G Site. (Plaintiff Exh. 14, p. 5; Michael Ferriola Direct testimony; Michael Mercado Direct testimony)

174. EPA employees Michael Ferriola and Michael Mercado also testified that they got headaches from breathing the chemicals in the air at the Site. (Michael Ferriola Direct testimony; Michael Mercado Direct testimony)

175. In April 1999, neighbors to the North complained to EPA that there were chemical odors from the J & G Site, depending upon the wind direction. (Plaintiff Exh. 14, p. 5, and Plaintiff Exh. 15, p. 3; Michael Mercado Direct testimony)

176. The neighbors to the North of the J & G Site lived about 1/4 to 1/2 mile away from the J & G Site (in a direct line). (Michael Mercado Redirect testimony; Michael Ferriola testimony) [12]

e. *Sample Results—Superfund Support Team Sampling Report*

177. The results of the April 1999 EPA sampling activities at the J & G Site were reported in the Superfund Contract Support Team Sampling Report for the April 12–19, 1999 sampling. (Stipulated Fact No. 24; Plaintiff Exh. 13 (text and some appendices of Plaintiff Exh. 13 are also contained in the Administrative Record, Plaintiff Exh. 134, at tab 8))

178. The drums sampled during the April 1999 sampling event contained RCRA [13] hazardous waste because the samples had flash points of less than 140 degrees Fahrenheit, which establishes that the waste is a RCRA hazardous waste for the characteristic of ignitability. (Mike Ferriola Direct testimony; Plaintiff Exh. 13, p. 10 and Appendix C pp. EPA 00772–EPA 00776)

179. CERCLA hazardous substances, including acetone and styrene, were found in drum samples, including some with high levels. Some of the drum samples taken in April 1999 had over 180,000 mg/kg (parts per million) of styrene. One of the drum samples taken in April 1999 had 4100 mg/kg (parts per million) of acetone. (Plaintiff Exh. 13, pp. 14–16 (Table 3); Michael Ferriola Direct testimony; Michael Mercado Direct testimony)

180. Dimethyl phthalate and arsenic are also CERCLA hazardous substances, as well as acetone, styrene, and MEK peroxide. (40 C.F.R. § 302.4; Michael Mercado Direct testimony; 40 C.F.R. § 302.4)

181. CERCLA hazardous substances, including styrene, arsenic, and dimethyl phthalate, were found in soil samples. One of the soil samples taken in April 1999 had 48,000,000 ug/L (parts per billion) of styrene, and one of the soil samples taken in April 1999 had 1,400,000 ug/L (parts per billion) of styrene. (Plaintiff Exh. 13, pp. 17–19 (Table 4); Mi-

12. Defendants' expert Neftalí Garcia stated that there were no neighbors to the North of the J & G Site closer than two miles from the Site. (Neftali Garcia Direct testimony) This statement was in error. (Plaintiff Exh. 187;

Michael Mercado Redirect and Michael Ferriola testimony.)

13. RCRA refers to the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.*

chael Mercado Direct testimony; Michael Ferriola Direct testimony)

182. As is standard operating procedure, EPA did not take its soil samples from the top of the ground surface. Rather, the EPA sampling personnel scraped off the top layer of soil or debris and took the soil samples from the soils beneath the surface. (Plaintiff Exh.13, Appendix A (QAPP)'s Appendix I (soil sampling procedures), p. 6; Michael Mercado Cross testimony).

183. Defendants' expert Neftali Garcia was not present when EPA took the soil samples. Defendants' expert Neftali Garcia's postulation that the high styrene levels found in some of the "soil samples" were the result of sampling gelled material that had leaked out of the drum onto the ground surface, rather than actual soils, has no basis and is erroneous. (Neftali Garcia Direct testimony)

184. Many of the soil samples taken in April 1999 had dimethyl phthalate in them. Dimethyl phthalate was a major ingredient in the MEK peroxide solution used at the J & G Site. No dimethyl phthalate was present in the soil background sample. (Plaintiff Exh. 13, pp. 10, 17–19, 49; Plaintiff Exh. 33, item 33–BO18, p. 1; Michael Mercado Direct testimony)

185. Paints sometimes include metals for pigmentation. (Michael Mercado Direct testimony)

186. While EPA decided that one background soil sample was sufficient for the April 1999 soil sampling at the J & G Site, EPA did not attribute inorganic compounds, such as arsenic or other metallic inorganic compounds, found in the samples of soils at the Site to the JG–24 operations at the Site unless the levels found were at least 3 times the level found in the soil background sample. (Plaintiff Exh. 13, p. 10; Michael Mercado Cross testimony)

187. The National Contingency Plan (NCP) does not specify the number of background soil samples to be taken. EPA's decision that one background soil sample was sufficient for the April 1999 soil sampling at the J & G Site was not inconsistent with the National Contingency Plan.[14] (40 C.F.R. Part 300)

188. Several of the soil samples had arsenic levels greater than 3 times the level in the soil background sample. One of the locations where a soil sample that had high levels of arsenic was taken was visibly stained with pigments from the JG–24 fiberglass product manufacturing operations. (Michael Mercado Direct testimony; Plaintiff Exh. 13, pp. 10, 17–19, 38)

f. *Soil Boring Results*

189. In addition to investigating the lateral extent of contamination at the Site by taking drum and soil samples at various locations in the manufacturing area, EPA also undertook some investigation of the vertical extent of contamination using geoprobe techniques in April 1999. (Plaintiff Exh. 16[15] and 17)

190. EPA, through its Weston contractor, collected samples from soils in the

---

14. Defendants' expert Neftali Garcia testified that it would not make sense for the National Contingency Plan to specify methodological details such as the number of background soil samples to be taken. (Neftali Garcia Cross testimony)

15. Plaintiff Exh. 16 is also in the Administrative Record, Plaintiff Exh. 134, at tab 7.

sinkhole areas at the J & G Site using geoprobe coring rods and monitored the air in the boreholes from which the cores were extracted. This work is described in a trip report dated April 28, 1999, regarding "Soil Sampling at the J & G 24 Corporation site," and in an Analytical Report, J & G Corporation Site, dated May 1999, both prepared by Weston for EPA. (Plaintiff Exh. 16 and 17; Stipulated Fact No. 25)

191. Laboratory results of soil core samples showed that acetone was detected in soils taken at 11.5 feet deep and 6 feet deep. Using field screening devices, organic vapors were also detected in the air in the boreholes from which cores were extracted in the main sinkhole at various depths. The organic vapors detected included acetone and styrene. (Plaintiff Exh. 16, pp. 00013 and 00017; Plaintiff Exh. 17, Table 1 (pp. EPA 01423–EPA 01424))

g. *Attempt to Sample Local Groundwater*

192. In addition, in April 1999, EPA also tried to take samples from local groundwater wells, but found out from local neighbors that almost all of the neighbors obtained their water from PRASA (Puerto Rico Water Authority) and not from local groundwater, except for a tree nursery whose well was not functional at the time. (Plaintiff Exh. 14, p. 5; Michael Mercado Direct testimony)

193. Based on the facts stated above, there were releases and threatened releases of CERCLA hazardous substances into the environment at the J & G Site.

6. *Decision to Conduct Removal Action*

194. After evaluation of the results of the April 1999 sampling and investigatory activities, EPA determined that there were releases and threats of releases of CERCLA hazardous substances at and from the J & G Site, including a leaking of hazardous substances into the soil with the potential to leach into the underlying groundwater aquifer through the on-site sinkhole, airborne releases of organic solvents containing hazardous substances, and a fire and explosion hazard. Therefore, EPA determined that a removal action at the Site was appropriate, including the excavation, characterization, and off-site transportation and disposal of the drums and underlying soils, as documented in the Action Memorandum for the removal action which was approved at EPA on September 30, 1999. (Plaintiff Exh. 15 (also contained in the Administrative Record, Plaintiff Exh. 134, at tab 15))

195. As shown in the Action Memorandum, EPA considered the relevant factors specified in the removal action portion of the National Contingency Plan, 40 C.F.R. § 300.415(b)(2). EPA determined that seven (7) of the factors referred to in the NCP were applicable to the J & G Site based on facts summarized in the Action Memorandum, and thus that a removal action was appropriate. (Plaintiff Exh. 15, pp. 7–9; Michael Ferriola Direct testimony)

196. As set forth in the Action Memorandum, EPA selected a removal action that included the excavation and characterization of the drums at the Site and the off-Site transportation

and disposal of hazardous wastes and substances. Removal of drums, barrels, tanks, or other bulk containers that contain or may contain hazardous substances is a standard type of removal action under the NCP, 40 C.F.R. § 300.415(e)(7). (Plaintiff Exh. 15, pp. 10–11)

197. Bioremediation, referred to by Defendants' expert Neftali Garcia, is not listed in the list of standard types of removal actions under the NCP, 40 C.F.R. § 300.415(e).

198. Defendants' expert Neftali Garcia said that, under certain circumstances, releases of acetone or styrene can cause a fire or explosion hazard. He agreed that, under certain conditions, even an empty container of acetone with some residue in it could explode. (Neftali Garcia Cross Testimony)

199. Causing a fire or explosion hazard can imperil people and the environment. (Stipulated Fact No. 34)

200. Defendants' expert Neftali Garcia opined that there was a low risk of fire at the J & G Site because it was not a "confined area." The Material Safety Data Sheets for acetone, polyester resin solution in styrene, and MEK peroxide state that these chemicals pose a threat of fire and explosion. They do not state that these chemicals only pose a threat of fire or explosion in "confined areas." Defendants' expert Neftali Garcia's opinion is also contradicted by the evidence that there had already been a fire in a portion of the metal pole barn sheds at the J & G Site before EPA's sampling investigation in April 1999. (Neftali Garcia Direct testimony; Plaintiff Exh. 33, items BO9, BO12, and BO16; Michael Ferriola Direct testimony)

201. Based on the facts set forth above, EPA's determination to conduct a removal action at the J & G Site, including the excavation and characterization of the drums at the Site and the off-Site transportation and disposal of hazardous wastes and substances, was not arbitrary or capricious and was not inconsistent with the NCP.

**7. March 2000 Overflight**

202. In March 2000, in order to determine if conditions had changed at the J & G Site, EPA OSC Michael Ferriola arranged for an overflight because of the problems that had been previously experienced in obtaining access to the Site. (Michael Ferriola Direct testimony; Plaintiff Exh. 192)

203. During the March 2000 fly over, EPA OSC Michael Ferriola observed that there were many more drums stored at the J & G Site than had been observed during the April 1999 investigation and sampling activities. (Stipulated Fact No. 26)

204. During the March 2000 fly over, EPA OSC Michael Ferriola also observed individuals at the J & G Site unloading 55 gallon drums from a flatbed truck directly into a sinkhole at the Site. Then, as the March 2000 fly over continued and workers looked up, EPA OSC Michael Ferriola observed individuals that had unloaded the drums into the sinkhole proceeding to remove the drums from the sinkhole and load them back onto the flatbed truck. (Michael Ferriola Direct testimony)

**8. May/June 2000 Inspection**

205. On or about April 19, 2000, the United States filed the original Com-

plaint in this case, seeking access to the J & G Site for the removal action and determining the need for and selecting any additional response actions, and on May 4, 2000 (entered on May 9, 2000), this Court issued an order granting the United States' motion for an immediate order in aid of access to the J & G Site. (Stipulated Fact Nos 27 and. 28)

206. After the May 4, 2000 Order of this Court, providing for access to the J & G Site, EPA On Scene Coordinator Michael Ferriola visited the J & G Site on May 31, 2000 and June 1, 2000. (Stipulated Fact No. 29)

207. In that visit, he observed that the several hundred drums that he had previously observed within and around the sinkhole appeared to have been crushed, moved, and/or buried within the area that previously comprised the sinkhole. The vegetation on one side of the sinkhole was no longer there. He also observed that there were several areas where burning of drums and wastes had taken place. The areas were still smoldering and there were vapors coming off which emitted chemical odors. (Michael Ferriola Direct testimony; Plaintiff Exh. 193, *e.g.* pp. 193–4, –5–, –7–, –8, –11, –12 –20, –23, –25–, –32).

208. Defendants' expert Neftali Garcia testified that open burning of polymerized styrene will result in releases of styrene. (Neftali Garcia Cross testimony)

209. Following the EPA On Scene Coordinator's observations at the J & G Site on May 31, 2000 and June 1, 2000, the United States sought further assistance from the Court through a motion seeking a revised order in aid of access to require the owners and operators to cease and desist from operations and activities at the J & G Site. (Stipulated Fact No. 30)

### 9. *Access and Cease and Desist Stipulation*

210. A hearing on the United States' motion for a revised order in aid of access was set for August 30, 2000. In lieu of the hearing, the parties entered into a Stipulation dated August 30, 2000, approved by the Court, which enjoined Defendants Jorge Ortiz and JG–24, Inc. from moving around soils, crushing and/or burying drums, and burning waste at the J & G Site. The Stipulation also specified that EPA would have access to the J & G Site for the removal action through August 30, 2001. (Stipulated Fact No. 31)

211. Access for the EPA removal action, along with the injunction requiring Defendants to cease moving around soils, crushing and/or burying drums, and burning waste, was later extended to December 31, 2001, by Order of the Court dated August 15, 2001. (Stipulated Fact No. 32)

### 10. *RCRA Violations*

212. Acetone and styrene each have a flashpoint of under 140 degrees Fahrenheit. Wastes with a flashpoint of under 140 degrees Fahrenheit are RCRA hazardous wastes. (Stipulated Fact Nos. 124, 125)

213. As a result of JG–24's manufacturing operations, wastes were generated at the J & G Site, including RCRA hazardous wastes. (Plaintiff Exh. 13, pp. 2–10; Plaintiff Exh. 14, p. 7; Plaintiff Exh. 15,

pp. 2, 5; Michael Ferriola Direct testimony)

214. Deteriorated, open drums containing RCRA hazardous wastes were stored or disposed of at the J & G Site. JG–24 employees let leftover resins with ignitable materials in drums with holes volatilize at the J & G Site. (Plaintiff Exh. 13, pp. 2–10 and Table 3; Plaintiff Exh. 14, pp. 5–6; Plaintiff Exh. 15, pp. 2–3)

215. There was evidence that drums with flammable chemical wastes were burned at the J & G Site during Defendants' period of operations at the J & G Site, including in May–June 2000 and August 2000. (Michael Ferriola Direct testimony)

216. Drums were buried and partially buried at the J & G Site, some with labels showing they were of the same type of drums used in the JG–24 fiberglass product manufacturing operations. Later excavation showed that drums with RCRA hazardous wastes had been buried at the J & G Site. (Plaintiff Exhs. 13, 14, 46, 47, 48, 50; Michael Ferriola Direct testimony)

217. Under RCRA, EPA is the implementing agency for facilities in the Commonwealth of Puerto Rico. (66 Fed.Reg. 27257)

218. Under the RCRA regulations, owners and operators of any facility at which RCRA hazardous wastes are treated, stored, or disposed must obtain a RCRA facility identification number. Neither JG–24 nor Jorge Ortiz obtained an RCRA facility identification number from EPA for the J & G Site, and the J & G Site does not have and has not had a RCRA generator or treatment, storage, or disposal facility identification number. (Eduardo Gonzalez Direct testimony; 40 C.F.R. §§ 262.12, 264.11)

219. The purpose of the RCRA facility identification number requirement is to assist in achieving one of the objectives of RCRA, which is to provide from beginning to end management of hazardous wastes in order to prevent harm to human health and the environment. (Philip Flax Direct testimony)

220. Under the RCRA regulations and statute, owners and operators of facilities that treat, store, or dispose of RCRA hazardous wastes must obtain a RCRA permit. Neither JG–24 nor Jorge Ortiz obtained a RCRA permit allowing for the treatment, storage, or disposal of RCRA hazardous wastes at the J & G Site, and the J & G Site does not have and has not had a permit for the treatment, storage or disposal of hazardous waste under RCRA. (Eduardo Gonzalez Direct testimony; 40 C.F.R. Part 270 and RCRA Section 3005)

221. Failure to obtain an RCRA permit is a serious violation as the purpose of the permitting process is to assure that no hazardous wastes are treated, stored or disposed of unless they will be adequately managed to avoid adverse effects on the public and the environment. (Eduardo Gonzalez Direct testimony; Philip Flax Direct testimony)

222. Under the RCRA regulations, owners and operators of facilities that treat, store, or dispose of RCRA hazardous wastes are required to submit biennial reports

to EPA. Neither JG–24 or Jorge Ortiz submitted biennial reports for the J & G Site to EPA, as there is no record of any biennial reports having been submitted for the J & G Site at EPA, and there were also none at the Puerto Rico Environmental Quality Board ("EQB"). (Eduardo Gonzalez Direct testimony; 40 C.F.R. 264.75)

223. Under the RCRA regulations, owners and operators of facilities that treat, store, or dispose of RCRA hazardous wastes are required to assure that: (1) whenever a container which has hazardous waste is severely rusting, has an apparent structural defect, or is beginning to leak, the hazardous waste is transferred to a sound container, and (2) containers with hazardous waste are always kept closed, except when necessary to add or remove waste. JG–24 and Jorge Ortiz did not follow these practices as there were numerous drums that were rusting, defective, and/or leaking at the Site, some of which contained RCRA hazardous wastes, and many of the drums were open, including ones that had RCRA hazardous wastes. (Michael Ferriola Direct testimony, Plaintiff Exhs. 13, 14, and 15; 40 C.F.R. 264, Subpart I)

224. Under the RCRA regulations, owners and operators of facilities where RCRA hazardous wastes are being landfilled, i.e., buried, are required to provide a liner and leachate collection and removal system. JG–24 and Jorge Ortiz did not provide a liner and leachate collection and removal system in connection with their land disposal of drums, some of which contained RCRA hazardous

wastes. (Michael Ferriola Direct testimony; Plaintiffs' Exhibits 46–50; 40 C.F.R. 264, Subpart N)

225. Under the RCRA regulations, owners and operators of facilities where RCRA hazardous wastes are treated, stored, or disposed of, are required to prevent the unknowing entry of livestock into such facilities to prevent physical contact with or disturbance of waste. JG–24 and Jorge Ortiz did not prevent the unknowing entry of livestock into the manufacturing area at the J & G Site where drums, some of which contained RCRA hazardous wastes, were being stored or disposed of, as livestock could be seen grazing in the area and there were cattle droppings in the area. (Michael Ferriola Direct testimony; Plaintiff Exh. 192, e.g. pp. 192–21, –22, –43, –53; 40 C.F.R. 264.14)

226. Under the RCRA regulations, owners and operators of facilities where RCRA ignitable hazardous wastes are treated, stored, or disposed of are required to prevent accidental ignition of ignitable materials, including the requirement of conspicuously placing "No Smoking" signs. JG–24 and Jorge Ortiz did not comply with this requirement as there were no "No Smoking" signs conspicuously placed in the manufacturing area at the Site. (Michael Ferriola Direct testimony; 40 C.F.R. 264.17)

227. Under the RCRA regulations, in order to allow access in an emergency, owners and operators of facilities where RCRA hazardous wastes are treated, stored, or disposed of are required to maintain adequate aisle space between stor-

age containers. The J & G Site was not in compliance with this requirement. (Michael Ferriola Direct testimony; 40 C.F.R. 264.35)

228. Under the RCRA regulations, owners and operators of facilities where RCRA hazardous wastes are treated, stored, or disposed of are required to maintain liability insurance for bodily injury or property damage to third parties caused by sudden or nonsudden accidental occurrences arising from the operations at the facility. Neither JG–24 nor Jorge Ortiz had or have liability insurance for the J & G Site. They did not have casualty, general liability, or excess insurance for the J & G Site. (Stipulated Fact Nos. 33, 108; 40 C.F.R. 264.147(a), (b))

229. There was ongoing storage or disposal of RCRA hazardous wastes by the Defendants without an RCRA permit and without liability insurance, as well as other RCRA violations, as of at least April 14, 1999. This storage or disposal of RCRA hazardous wastes by the Defendants without a permit and without insurance, as well as other RCRA violations, continued through at least August 30, 2000, when the access and cease and desist Stipulation was signed and JG–24 ceased manufacturing operations at the Site. The ongoing storage and disposal is confirmed by the fact that RCRA hazardous waste was found in drums collected and excavated by EPA during the removal action. The period from April 1999 through August 2000 constitutes approximately 500 days of RCRA violations.

## 11. *Removal Action*

230. Following a period in which Defendants Jorge Ortiz and JG–24, Inc. removed equipment and other material used in their operations, EPA's mobilization for the removal action at the J & G Site began on October 10, 2000. Mobilization activities included repair of the access road, installing an equipment fence, set-up of trailers, and installation and activation of electric service for the office trailers. (Michael Ferriola Direct testimony)

231. After the mobilization, EPA conducted a clean-out of the metal pole barn structures and other building structures and a floor scrape to remove gross build up of styrene resin and other waste fiberglass materials at the J & G Site. (Michael Ferriola Direct testimony)

232. During the removal action at the J & G Site, EPA stockpiled contaminated soil and debris for characterization for off-site disposal. Approximately 700 cubic yards of this material was shipped to the BFI landfill in Ponce. These materials contained CERCLA hazardous substances, such as styrene, although they were not RCRA hazardous wastes. (Michael Ferriola Direct, Cross, and Redirect testimony; Plaintiff Exh. 45, e.g. pp. EPA06978—EPA 06979)

233. During the removal action at the J & G Site, EPA collected several hundred drums in a surficial drum collection. Some of the drums contained styrene type materials. (Michael Ferriola Direct testimony)

234. During the clean-out of the metal pole barn structures and other buildings at the J & G Site, EPA discovered that drums had been buried

within the earthen floors of these structures and between the various terraced levels. (Michael Ferriola Direct testimony)

235. In order to identify the extent of the buried drum areas, EPA arranged for the conduct of geophysical survey work at the J & G Site. To minimize interferences from metal during the conduct of the geophysical survey and to remove exposed drums and partially buried drums, EPA removed the metal pole barn structures at the J & G Site. During the conduct of the geophysical survey at the J & G Site, a total of six anomalies indicating the likely presence of buried drums were identified. (Michael Ferriola Direct testimony; Stipulated Fact Nos. 35, 36)

236. EPA conducted the excavation of the six anomalies at the J & G Site in May and June 2001 and the sinkhole area at that Site in July and August 2001. (Stipulated Fact No. 37)

237. During the removal action, a total of approximately 2500 drums were excavated during the removal action at the J & G Site. (Michael Ferriola Direct testimony)

238. Many of the drums unearthed during the removal action at the J & G Site had been severely burned, charred, broken, crushed, rusted, and/or had holes in them. (Michael Ferriola Direct testimony)

239. The empty drum carcasses, along with other scrap metal (such as from the dismantling of the pole barn structures), were recycled as scrap metal through Scorpio Recycling. Scorpio charged only for the transportation of the rolloff containers in which the scrap metal was placed. The cost of the transportation was $200 per load for 22 rolloff loads, or $4400. (Michael Ferriola Cross tes-

timony). However, under the Court's questioning, Mr. Ferriola acknowledged that the drums were non-hazardous material and that the drums were not required to be removed but that it was to make the area "look neat". Consequently, the cost of $4,400 is disallowed. (Michael Ferriola testimony)

240. Numerous drums unearthed during the removal action at the J & G Site exhibited elevated readings on air monitoring equipment, the Foxboro total vapor analyzer (TVA 1000), indicating the presence of solvent vapors. (Michael Ferriola Direct testimony)

241. EPA placed drums containing waste materials that were collected or excavated at the J & G Site during the removal action into a drum storage area. (Michael Ferriola Direct testimony)

242. Solid and liquid flammable wastes from the drums collected and excavated at the J & G Site during the removal action were shipped off-site under the DOO1 waste code (RCRA ignitable hazardous waste code) to an incinerator that was licensed to incinerate RCRA hazardous wastes. (Michael Ferriola Direct testimony)

243. Approximately 100 drums excavated and collected at the J & G Site had RCRA hazardous waste materials in them that had to be shipped off-site for proper disposal through licensed incineration. (Michael Ferriola Cross testimony)

12. *Groundwater Monitoring*

244. EPA conducted the installation of four groundwater monitoring wells in proximity to the sinkhole area at the J & G Site in August 2001. (Michael Ferriola Direct testimony)

245. Following removal of the buried drums, EPA conducted three groundwater sampling events at the J & G Site. The first event was in the week starting October 29, 2001; the second event was in the week of March 11, 2002; and the third event was in the week of July 22, 2002. (Michael Ferriola Direct testimony; Michael Mercado Direct testimony; Plaintiff Exhs. 83, 84, and 87)

246. Groundwater monitoring is conducted after source removal to see if removal of the source is sufficient to protect the groundwater or whether additional long term groundwater monitoring and remediation is necessary. In the first groundwater sampling event, acetone was detected in the groundwater. In the second groundwater sampling event, acetone was again detected in the groundwater, but at lower concentrations. In the third groundwater sampling event, acetone was detected again, but at still lower levels. EPA concluded that the groundwater was improving after the removal of the drums and no further action was needed to remediate groundwater.(Michael Mercado Direct testimony; Plaintiff Exh. 83, pp. 10–12, Plaintiff Exh. 84, pp. 5–11; and Exhibit 87, pp. 6–10, especially p. 6)

### 13. *Costs*

247. EPA has expended Superfund monies to pay various governmental response costs associated with the J & G Site in Vega Alta, Puerto Rico. (Stipulated Fact No. 38)

248. The Financial Services Section of EPA generates reports regarding the amount of response costs incurred at a Superfund site using a computer program known as the Superfund Cost Recovery Package Imaging and On–Line System ("SCORPIOS"). The reports generated using this computer system are known as "SCORPIOS Reports." (Stipulated Fact No. 39)

249. The SCORPIOS Reports for an individual Superfund site contain a listing of each response cost incurred and paid regarding that site. The costs listed in the SCORPIOS Reports are documented by the cost documentation package prepared by the Financial Management Branch. These site-specific costs are organized into categories such as EPA payroll, travel, and contractual costs associated with response actions. This information is contained in EPA's accounting system. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159, 160, 161, and 162)

250. EPA has incurred costs in connection with response actions at the J & G Site for labor of EPA personnel, travel by EPA personnel, and EPA indirect costs. These costs are detailed in site-specific payroll reports, site-specific travel reports, and indirect cost reports. Some of these costs were incurred for labor of employees of EPA's Regional offices in Edison, New Jersey, New York, and Puerto Rico, and some were incurred for labor of EPA's headquarters employees in Washington, D.C. (Jo–Ann Velez Direct testimony)

251. EPA requires a number of controls to ensure the accuracy of the labor hours billed by its employees, including certification by each employee of time sheets and review by EPA supervisors. (Jo–Ann Velez Direct testimony)

252. EPA also incurred costs at the J & G Site for response actions performed by persons other than EPA employees, such as contractors.

These costs were incurred by EPA through agreements with individual contractors. (Stipulated Fact No. 40)

253. EPA expenditures for contractor services are documented by contract vouchers/invoices, which are issued periodically by a contractor for work charged under the contract for that time period. (Stipulated Fact No. 41)

254. The U.S. Treasury then makes the payments to the contractor for the services they provide to EPA on response actions, which is business to the contractor. (Stipulated Fact No. 42)

255. EPA requires a number of controls to ensure the accuracy of costs billed by its contractors, including requiring the approval of a contract or project officer. (Jo–Ann Velez Direct testimony; Charles Young Direct testimony)

256. For most of EPA's contractors, in addition to the site-specific charge, there is an annual allocation rate applied to the site-specific charge. This annual allocation rate covers non-site specific contractor costs. These non-site specific costs, which are reflected in the contractor's annual allocation rates, are allocated to sites proportionally and included in the amounts paid to the contractors. (Stipulated Fact Nos. 43, 44, and Charles Young Direct testimony)

257. The first SCORPIOS Report for the J & G Site is based on the information contained in the underlying cost documentation maintained by EPA for the J & G Site and accurately reflects costs incurred and paid by EPA in connection with the J & G Site between June 7, 1998 and June 15, 2002 which had been documented as of 8/12/02. (Jo–Ann Velez Direct testimony; Exhibits 159 and 160)

258. The supplemental SCORPIOS Report for the J & G Site is based on the information contained in the underlying cost documentation maintained by EPA for the J & G Site and accurately reflects costs incurred and paid by EPA in connection with the J & G Site between June 16, 2002 and September 30, 2003, as well as some earlier costs incurred and paid by EPA for the J & G Site which had not been documented in the first J & G SCORPIOS package. (Jo–Ann Velez Direct testimony; Exhibits 161 and 162)

259. EPA has not been reimbursed by anyone for the costs it has incurred for response activities relating to the J & G Site. (Jo–Ann Velez Direct testimony)

260. EPA personnel performed work relating to the J & G Site, including conducting the site assessment, removal evaluation, removal action, and groundwater monitoring activities, and performing associated efforts to obtain access and cost recovery. (Michael Ferriola Direct testimony; Jo–Ann Velez Direct testimony)

261. EPA has incurred at least $165,131.04 in Regional Payroll Costs relating to the J & G Site, including $140,916.02 documented in the 1st J & G SCORPIOS report and package and $24,215.02 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

262. EPA has incurred at least $25,255.62 in Headquarters Payroll Costs relating to the J & G Site, including $20,073.56 documented in the 1st J

& G SCORPIOS report and package and $5,182.06 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

263. EPA has incurred at least $89,967.29 in Regional Travel Costs relating to the J & G Site, including $82,564.05 documented in the 1st J & G SCORPIOS report and package and $7,403.24 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

264. EPA has incurred at least $20,330.98 in Headquarters travel costs relating to the J & G Site, including $15,932.78 documented in the 1st J & G SCORPIOS report and package and $4,398.20 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

265. WRS Infrastructure and Environment, Inc. ("WRS") was employed by EPA under an Emergency and Rapid Response Service ("ERRS") contract to perform removal response activities at the Site. These activities included mobilization for the removal action, clean up of metal pole barn structures, surficial drum collection, excavation of buried drums, and transportation and off-site disposal of hazardous wastes and substances. (Michael Ferriola Direct testimony; Plaintiff Exhs. 159, 161; Jo–Ann Velez Direct testimony)

266. EPA has paid at least $830,444.38 to WRS for its work under ERRS contract No. 68–S2–9906 relating to the J & G Site, including $813,536.87 documented in the 1st J & G SCORPIOS report and package and $16,907.51 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

267. Lockheed Environmental Systems & Technologies was employed by EPA under an Environmental Monitoring Systems Laboratory ("EMSL") contract for aerial photographs of the J & G Site in 1999. (Stipulated Fact No. 46)

268. EPA has paid at least $510.95 to Lockheed Environmental Systems & Technologies for its work under EMSL contract No. 68–C5–0065 relating to the J & G Site. (Jo–Ann Velez Direct testimony; Plaintiff Exh. 159)

269. Lockheed Environmental Systems & Technologies was employed by EPA under an Environmental Services Assistance Teams ("ESAT") contract to analyze drum samples collected at the J & G Site in 1999 and to perform data validation regarding drum, water and soil samples collected there in 1999. (Stipulated Fact No. 47)

270. EPA has paid at least $33,997.37 to Lockheed Environmental Systems & Technologies for its work under ESAT contract No. 68–D6–0002 relating to the J & G Site. (Jo–Ann Velez Direct testimony; Plaintiff Exh. 159)

271. Lockheed Martin Services, Inc. was employed by EPA under ESAT contract No. 68–W0–1016 to analyze groundwater samples collected from the four groundwater monitoring wells at the J & G Site following the removal action. (Michael Ferriola Direct testimony; Plaintiff Exhs. 159, 161; Jo–Ann Velez Direct testimony)

272. EPA has paid at least $56,129.54 to Lockheed Martin Services, Inc. for its work under ESAT contract No.

68–W0–1016 relating to the J & G Site, including $26,690.77 documented in the 1st J & G SCORPIOS report and package and $29,438.77 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

273. Lockheed Martin Services, Inc. was employed by EPA under contract No. 68–C9–9223 to conduct the geophysical survey work, installation of groundwater monitoring wells, and closure of groundwater monitoring wells at the J & G Site. (Michael Ferriola Direct testimony; Jo–Ann Velez Direct testimony)

274. EPA has paid at least $283,043.36 to Lockheed Martin Services, Inc. for its work under Contract No. 68–C9–9223 relating to the J & G Site, including $264,708.48 documented in the 1st J & G SCORPIOS report and package and $18,334.88 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

275. GRB Environmental Services, Inc. was employed by EPA under contract No. 68–S2–0017 for organizing and filing of documents regarding the J & G Site. (Stipulated Fact No. 48)

276. EPA has paid at least $8,006.65 to GRB Environmental Services, Inc. for its work under Contract No. 68–S2–0117 relating to the J & G Site, including $920.25 documented in the 1st J & G SCORPIOS report and package and $7,086.40 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

277. Roy F. Weston, Inc. was employed by EPA under a Response, Engineering & Analytical Contract ("REAC") contract to conduct sinkhole sampling and analysis at the J & G Site in April 1999. (Stipulated Fact No. 49)

278. EPA has paid at least $15,350.77 to Roy F. Weston, Inc. for its work under REAC contract No. 68–C4–0022 relating to the J & G Site. (Jo–Ann Velez Direct testimony; Plaintiff Exh. 159)

279. Roy F. Weston, Inc. was employed by EPA under Superfund Tech Assessment and Response Team ("START") contracts to provide technical assistance to EPA at the J & G Site in performance of removal site assessment activities, the removal action, and post-removal action activities, including inspection of drums and air monitoring, sampling of liquids and solids, providing photo-documentation of site activities, health and safety monitoring, and administrative record compilation. Prior to August 2000, this work was performed by Roy F. Weston, Inc. under START contract No. 68–W5–0019, and beginning in August 2000, this work was performed by Roy F. Weston, Inc. under START contract No. 68–W0–0113. (Stipulated Fact No. 50)

280. EPA has paid at least $60,218.90 to Roy F. Weston, Inc. for its work under START contract No. 68–W5–0019 relating to the J & G Site. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159)

281. EPA has paid at least $235,754.78 to Roy F. Weston, Inc. for its work under START contract No. 68–W0–0113 work relating to the J & G Site, including $211,983.34 documented in the 1st J & G SCORPIOS report and package and $23,771.44 documented in the 2nd SCORPIOS re-

port and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

282. EPA utilized the Contract Laboratory Program (CLP) for the analyses of surficial water and soil samples collected at the J & G Site during the removal site assessment in 1999. DynCorp, Inc. managed the samples for the Contract Laboratory Program, and the samples were analyzed by Southwest Laboratory of Oklahoma, Inc., and Sentinel, Inc. (Stipulated Fact No. 51)

283. EPA has paid at least $37,657.44 for CLP costs for work relating to the J & G Site, including $37,577.89 documented in the 1st J & G SCORPIOS report and package and $79.55 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

284. The United States Coast Guard provided technical assistance to EPA at the J & G Site, pursuant to Interagency Agreement DW69941665, during the performance of the removal action, including inspection of drums, air monitoring, sampling of liquids and solids, providing photo-documentation of site activities, and health and safety monitoring. (Stipulated Fact No. 52)

285. EPA has paid at least $82,764.96 to the United States Coast Guard for its work under Interagency Agreement DW69941665 relating to the J & G Site. (Jo–Ann Velez Direct testimony; Plaintiff Exh. 161)

286. EPA has paid at least $1,944,564.03 in direct costs relating to the J & G Site, including EPA personnel and travel costs and contractor costs, including $1,724,982.00 documented in the 1st J & G SCORPIOS report and package and $219,582.03 docu-

mented in the 2nd SCORPIOS report and package. (Plaintiff Exhs. 159–162)

287. EPA's indirect costs are calculated for each Superfund site. EPA's indirect costs are EPA costs necessary to operate the Superfund program but which are not directly attributable to specific sites. They support site-specific cleanup efforts. EPA's indirect costs include such expenses as overall program management, administrative support, rent, utilities, and employee fringe benefits. (Stipulated Fact Nos. 45, 53; Charles Young Direct testimony)

288. The process of allocating or distributing indirect costs to the Superfund program is accomplished through an indirect cost methodology prepared by EPA. (Stipulated Fact No. 54)

289. The Federal Financial Management Improvement Act requires federal agencies to comply with published Federal Accounting Standards in their activities. One such standard is the Office of Management and Budget's Statement of Federal Financial Accounting Standard # 4, "Managerial Cost Accounting Concepts and Standards for the Federal Government" (SFFAS # 4). (Stipulated Fact No. 55)

290. EPA has implemented a full-cost indirect cost methodology to comply with SFFAS # 4, as mandated by the Federal Financial Management Improvement Act. Both KPMG and GAO concluded that EPA's indirect cost methodology is in compliance with SFFAS # 4. (Charles Young Direct testimony)

291. Pursuant to that full-cost indirect cost methodology, EPA has identified the indirect costs associated with the Superfund program and has

developed full-cost indirect cost rates in order to allocate those costs to particular Superfund Sites within each EPA Region. (Stipulated Fact No. 56)

292. Indirect cost rates applicable to the J & G Site, beginning in Fiscal Year 1999, were computed in accordance with EPA's full-cost indirect cost methodology, and are as follows:

FY 1998 (10/1/97—9/30/98): 28.97%
FY 1999 (10/1/98—9/30/99): 28.32%
FY 2000 (10/1/99—9/30/00): 23.46%
FY 2001 (10/1/00—9/30/01): 28.18%
FY 2002 (10/1/01—9/30/02): 28.18%
FY 2003 (10/1/02—9/30/03): 28.18%

(Stipulated Fact No. 57; Plaintiff Exh. 159; Charles Young Direct testimony)

293. EPA followed standard cost accounting practices in developing its full-cost indirect cost rates. For example, EPA calculated indirect cost rates by fiscal year for each EPA Region. Computing indirect cost rates by fiscal year is a generally accepted practice. (Stipulated Fact No. 58; Charles Young Direct testimony)

294. EPA's full-cost indirect cost methodology has been reviewed and deemed acceptable by the international accounting firm of KPMG and by the General Accounting Office (GAO). (Stipulated Fact No. 59; Charles Young Direct testimony)

295. In developing EPA's full-cost indirect cost methodology, EPA identified its direct costs, its indirect costs, and a manner to distribute the indirect costs to the direct costs. (Stipulated Fact No. 60)

296. Indirect costs are allocated among the individual Superfund sites. To determine the indirect costs associated with any particular Superfund site, each region identifies the direct, or site-specific, costs EPA incurred at a particular Superfund site each fiscal year, and multiplies the appropriate indirect cost rate for that fiscal year by the direct costs for that site. The product is the amount of indirect costs allocated to that site—equivalent to that site's proportionate share of the program's supporting costs. Adding together the direct (site-specific) costs and the indirect costs results in the full costs to EPA of the response action at that site. (Stipulated Fact No. 61)

297. EPA incurred at least $546,381.19 in indirect costs for the J & G Site between June 7, 1998 and September 30, 2003, including $484,502.96 documented in the 1st J & G SCORPIOS report and package and $61,878.23 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exhs. 159–162)

298. Between 06/07/1998 through 09/30/2003, EPA incurred at least $2,490,945.22 in total direct and indirect costs for the response activities relating to the J & G Site, including $2,209,484.96 documented in the 1st J & G SCORPIOS report and package and $281,460.26 documented in the 2nd SCORPIOS report and package. (Jo–Ann Velez Direct testimony; Plaintiff Exh. 163)

299. The SCORPIOS Reports for the J & G Site does not include EPA costs incurred prior to June 7, 1998 or after September 30, 2003, relating to the J & G Site. (Jo–Ann Velez Direct testimony)

300. The SCORPIOS Reports for the J & G Site does not include any prejudgment interest with respect to the J & G Site. (Jo–Ann Velez Direct testimony)

301. The SCORPIOS Reports for the J & G Site does not include any Department of Justice costs expended with respect to the J & G Site. (Jo–Ann Velez Direct testimony)

302. Rubino & McGeehin, Chartered ("R & M") is under contract with the United States Department of Justice Environment and Natural Resources Division ("ENRD") to assist in the accumulation, processing, and reporting of information relating to costs incurred by the ENRD in the prosecution of cases under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA" or "Superfund"), as amended. (Stipulated Fact No. 62)

303. R & M has accumulated, summarized and reported costs incurred by ENRD for the J & G Site between October 1998 and September 2003. (Stipulated Fact No. 63)

304. The costs which ENRD has incurred and paid are segregated into three areas—Direct Labor Costs, Other Direct Costs, and Indirect Costs. (Stipulated Fact No. 64)

305. Direct Labor Costs of attorneys and paralegals of ENRD are calculated using information summarized from time data input by ENRD employees and bi-weekly salary information supplied to R & M by ENRD. (Stipulated Fact No. 65)

306. R & M uses all hours (including non-case hours) accounted for by a particular employee of ENRD for the biweekly period and the employee's biweekly salary cost to calculate an effective hourly rate for the biweekly period. (Stipulated Fact No. 66)

307. Other Direct Costs of ENRD are expenses specifically identified to a case through ENRD's accounting system. These items include, but are not limited to, costs paid for travel, expert witnesses, special masters, deposition and trial transcripts, and litigation support costs. (Stipulated Fact No. 67)

308. ENRD also incurs indirect costs which support all ENRD cases. ENRD indirect costs, include, but are not limited to, indirect labor (e.g., attorney and paralegal administrative time, secretarial support, accounting support, record keeping, and time keeping), compensated absences (e.g., vacation, holiday, and sick time), fringe benefits, office space and utilities. (Stipulated Fact No. 68)

309. The indirect cost rate for ENRD is calculated by dividing the total of the indirect costs for a fiscal year by a base consisting of the total ENRD direct labor costs for that fiscal year to produce a division-wide indirect cost rate by fiscal year. Thus, if .5% of the total ENRD direct labor costs are incurred on a particular case, then .5% of the total ENRD indirect costs would be allocated to the case. (Stipulated Fact No. 69)

310. Based on the R & M system of accumulating costs, R & M has prepared a summary of ENRD's costs relating to the Site under DOJ # 90–11–3–1778/1, which is the initial DOJ number that was assigned to the J & G Site. (Stipulated Fact No. 70)

311. Based on the R & M system of accumulating costs, R & M has prepared a summary of ENRD's costs relating to the Site under DOJ # 90–11–3–1778/2, which is the second DOJ number that was assigned to the J & G Site. (Stipulated Fact No. 71)

312. The summary relating to DOJ's costs for the J & G Site under DOJ # 90–11–3–1778/1 is based on the information contained in the underlying costs documentation maintained by R & M for the J & G Site, and accurately reflects the costs incurred by ENRD for that Site under DOJ # 90–11–3–1778/1. (William Kime Direct testimony; Plaintiff Exh. 165)

313. The total costs incurred by ENRD regarding the J & G Site, exclusive of interest, under DOJ # 90–11–3–1778/1 are $162,390.15. These costs were incurred in federal Fiscal Years ("FY") 1999, 2000, 2001, and 2002. (William Kime Direct testimony; Plaintiff Exh. 165)

314. The summary relating to DOJ's costs for the J & G Site under DOJ # 90–11–3–1778/2 is based on the information contained in the underlying costs documentation maintained by R & M for the J & G Site, and accurately reflects the costs incurred by ENRD for that Site under DOJ # 90–11–3–1778/2 through September 30, 2003. (William Kime Direct testimony; Plaintiff Exh. 166)

315. As of September 30, 2003, the costs incurred by ENRD regarding the J & G Site, exclusive of interest, under DOJ # 90–11–3–1778/2 are $500,717.40. These costs were incurred in FY 2001, 2002, and 2003. (William Kime Direct testimony; Plaintiff Exh. 166)

316. The total costs incurred by ENRD regarding the J & G Site, exclusive of interest, under DOJ # 90–11–3–1778/1 and # 90–11–3–1778/2 in FY 2001 through FY 2003 is $663,107.55. (William Kime Direct testimony; Plaintiff Exh. 164)

317. Additional costs continue to be incurred by ENRD regarding the J & G Site after September 30, 2003 under DOJ# 90–11–3–1778/2. (William Kime Direct testimony)

### 14. *In Rem Claim Facts*

318. In May 2001, EPA Region II sent a letter containing a Notice of Potential Liability and Notification of Intent to Perfect a Lien, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601, et seq., to Jorge Ortiz and Gloria Alvarez Nieves, with a copy to Jorge Ortiz' attorney Benjamin Ortiz. This letter notified Jorge Ortiz and Gloria Alvarez Nieves of their potential liability, as well as the potential liability of JG–24, Inc., for response costs incurred by the United States relating to the J & G Site, and also notified them of EPA's intention to file a Notice of Federal Lien in the Registry of Property. (Stipulated Fact No. 72)

319. On May 16, 2001, Jorge Ortiz and his attorney at that time, Benjamin Ortiz, received a copy of the letter containing the Notice of Potential Liability and Notification of Intent to Perfect a Lien Under CERCLA, 42 U.S.C. Section 9601, et seq., sent by EPA Region II. (Stipulated Fact No. 73)

320. On or about June 26, 2001, EPA filed a Notice of Federal Lien on the J & G Site in the Registry of Property, Third Section, in Bayamón, Puerto Rico. The Notice of Federal Lien states that the United States holds a lien on the J & G Site pursuant to Section 107(*1*) of CERCLA to secure the payment of response costs incurred by the United States for which Jorge Ortiz and Gloria Alvarez Nieves are liable under Section 107(a) of CERCLA. The No-

tice of Federal Lien states that the lien applies to the real property located at Bajuras Ward, Vega Alta, Puerto Rico, shown on the Registry of Property, Third Section of Bayamón as Property No. 3327, which is registered at page 171 of Volume 56 of Vega Alta. (Stipulated Fact No. 74)

321. On June 13, 2002, this Court issued an Order granting the United States' motion for issuance of a warrant of arrest of the JG Site (Order entered on June 17, 2002). (Stipulated Fact No. 75)

322. On or about July 31, 2002, the United States Marshal's office executed the warrant of arrest on the J & G Site. (Stipulated Fact No. 76)

323. Notice of this case, the arrest of the J & G Site, and the *in rem* claim against the J & G Site in this case, was published in E1 Nuevo Dia on August 28, September 4, and September 11, 2002. (Stipulated Fact No. 77, 78)

324. Other than Defendants Jorge Ortiz and JG–24, Inc., no person has filed a claim, answer to the Amended Complaint, or application for intervention in this action claiming an interest in the J & G Site. (Stipulated Fact No. 79)

### 15. *Injunctive Stipulation*

325. On January 27, 2003, Defendants Jorge Ortiz and JG–24 stipulated that "Defendants Jorge Ortiz and JG–24, Inc. shall not conduct fiberglass product manufacturing or other activities involving CERCLA hazardous substances, including, but not limited to, acetone, styrene, methyl ethyl ketone peroxide, and ignitable solvents, at the Real Property of approximately 40 acres located at PR Road # 675, KM 4.0, Barrio Bajuras, Sector Los Chorros, Vega Alta, Puerto Rico, unless authorized by the Court. This Stipulation was approved by the Court and entered on January 31, 2003 (Docket No. 84)."

### F. *Facts Relating to United States' Claim re Cataño Facility*

#### 1. *Ownership of the Cataño Property*

326. The Cataño property is, and has been since December 1, 1986, owned in the name of "Fiberglass Dura Mas, Inc." (Stipulated Fact No. 239; Plaintiff Exh. 176, pp. 1–2)

327. There is a deed of purchase and sale of the Cataño property from the Puerto Rico Industrial Development Company, dated December 1, 1986, transferring the Cataño property to "Fiberglass Dura Mas, Inc." (Stipulated Fact No. 9; Plaintiff Exh. 78)

328. Carlos Capre Martinez was the authorized representative of "Fiberglass Duramas, Inc." for the purpose of signing the deed which transferred the Cataño property to "Fiberglass Duramas, Inc." (Stipulated Fact No. 163)

329. According to Carlos Capre Martinez, in 1986, Jorge Ortiz asked Carlos Capre Martinez to sign the purchase and sale papers on behalf of "Fiberglass Duramas, Inc." which transferred the Cataño property to "Fiberglass Duramas, Inc." (Stipulated Fact No. 240)

330. Carlos Capre Martinez says he has never been an owner, officer, or director of Fiberglass Dura Mas. (Stipulated Fact No. 241)

331. There were no leases of the Cataño facility or rental payments concerning the use of the Cataño facility at any time between 1985 and the pres-

ent. (Plaintiff Exh. 177, p. 2 (also admitted into evidence with the Motion Designating Deposition Transcripts))

332. Thus Defendant Jorge Ortiz' Distribuidora K–Aribe proprietorship has been using the property held in the name of Defendant Jorge Ortiz' Fiberglass Duramas proprietorship without paying any rent to Fiberglass Dura Mas since the inception of Distribuidora K–Aribe in 1992, and the fiberglass product manufacturing work being done for Jorge Ortiz by his JG–24 employees at the Cataño facility since the year 2000 has also been conducted without paying any rent to Fiberglass Dura Mas.

333. As the entity named on the deed, Defendant Duramas, Inc. (a/k/a Fiberglass Dura Mas) is the owner of the Cataño property. Since Jorge Ortiz is the proprietor of Fiberglass Dura Mas, he also is the owner of the Cataño property.

## 2. *Chemicals Stored and Used at the Cataño Facility*

334. A Material Safety Data Sheet tells people who use products what chemicals are in the product and what to do in the case of emergency. (Stipulated Fact No. 148)

335. Betsy Ortiz, an employee of Distribuidora K–Aribe until recently, a business that operates at the Cataño property, wrote in her own handwriting on top of various MSDS forms the name in Spanish by which she refers to the product. (Stipulated Fact No. 149; Plaintiff Exh. 33)

336. Distribuidora K–Aribe keeps MSDS ·forms on hand because customers wanted them. (Stipulated Fact No. 150)

337. Distribuidora K–Aribe keeps on hand MSDS forms for acetone, styrene, MEK peroxide, and polyester resin solution. (Stipulated Fact Nos. 151,152, 154, 156)

338. Distribuidora K–Aribe keeps on hand MEK peroxide and polyester resin solution and has had on hand styrene. (Stipulated Fact No. 153, 155, 157)

339. There was a fire at the Cataño facility in the 1990s. (Jorge Ortiz Direct testimony)

340. Acetone, styrene, and methyl ethyl ketone peroxide were and are used at the Cataño facility, including in the manufacture of fiberglass products. (Carmelo Mejia Deposition excerpt, p. 17, lines 13–22 (resin, secante)); (Efrain Vazquez Deposition excerpt, p. 14, lines 11–14, 24–25, through p. 15, lines 1–2 (acetone, gelcoat, secante, resin polyester); Plaintiff Exh. 33 (resins contain styrene; secante is MEK peroxide))

## 3. *Current Fiberglass Product Manufacturing at the Cataño Facility for Jorge Ortiz*

341. Fiberglass products are currently being made at the Distribuidora Karibe facility. The fiberglass manufacturing work being performed at the Distribuidora Karibe facility by former JG–24 employees is being and has been performed at the request of Jorge Ortiz. (Alberto Mendez Deposition Excerpt, p. 37, lines 14–19)

342. Efrain Vazquez's main duties at the J & G Site were to laminate the boats. Efrain Vazquez has been going to the Cataño facility to make fiberglass products, such as boats and/or tops of pickup trucks, since the year 2000. When he works at

the Cataño facility making fiberglass products, Efrain Vazquez is working for Jorge Ortiz, and Jorge Ortiz pays him for that work. (Efrain Vazquez Deposition Excerpt (admitted with grant of Motion to Designate Deposition Transcripts), p. 6, line 23–25, p. 7, lines 19–25, p. 8, lines 1–6, 16–21, p. 9, lines 8–24m p. 12, lines 16–24; Stipulated Fact No. 129)

343. Sometimes Carmelo Mejia and Manuel Rodriguez go to the Distribuidora KAribe location in Cataño to make swimming pools. When he works at the Cataño property, Carmelo is working for Jorge Ortiz and Jorge Ortiz pays him for that work, in cash. Carmelo Mejia has been going to the Cataño facility on an average of about 3–4 times per month. Generally he goes there to make two or three swimming pools at a time. Generally it takes about two days to make a swimming pool. He and another worker make about 4 swimming pools or maybe more a month. (Carmelo Mejia Deposition Excerpt (admitted with grant of Motion to Designate Deposition Transcripts), p. 10, line 13–25, p. 11, lines 1–25, p. 12, lines 1–10, p. 15, line–25, p. 16, lines 1–6; Stipulated Fact No. 130)

344. Fiberglass product manufacturing is also being done on a custom basis at the Cataño facility by Frank Hichez. (Carmelo Mejia Deposition excerpt, p. 12, lines 23 through p. 13, lines 1–4)

345. Jorge Ortiz, doing business as Dura Mas and/or Distribuidora K–Aribe, has been using the Cataño facility from at least June 2001 forward for the conduct of fiberglass product manufacturing operations. Those operations use resins and other ma-

terials which include acetone, styrene, and methyl ethyl ketone peroxide.

4. *Inspections and RCRA Information Request*

346. In December 1997, EPA inspector Eduardo Gonzalez inspected the Cataño facility and observed deteriorated drums, including bulging drums, and smelled strong solvent odors. (Eduardo Direct testimony; Plaintiff Exh. 198, e.g. 198–4, 198–7)

347. On June 8, 2001, in response to a complaint by a neighboring facility, EPA inspector Eduardo Gonzalez conducted an inspection at the Cataño facility. During the inspection, the EPA inspector observed over one hundred 55–gallon drums haphazardly placed throughout the facility, of which some were dumped into areas of vegetation at or near the periphery of the property. Many of the drums were in severely deteriorated condition, including rusted, corroded, dented, collapsed, bulging, inflated, and/or leaking and stained drums. Some of these deteriorated drums were labeled "Acetone" and "Resin Solution." Many of the drums were placed directly onto the earthen floor. (Eduardo Gonzalez Direct testimony; Plaintiff Exh. 119)

348. In the June 8, 2001 inspection, EPA inspector Eduardo Gonzalez observed several areas of dark stained soils at the facility, including areas of staining near or next to deteriorated, leaking or stained drums, some of which were labeled "Acetone" or "Resin Solution," and some stained soils were located in areas of the manufacturing operations. He also observed three piles of discarded fiberglass mats impacted with

resin solution and solvents that were mixed with domestic garbage, as well as three 55–gallon drums containing such wastes. In addition, he observed leaks in many places over the floor area of the Cataño facility. He also observed many bags of organic peroxide powder labeled methyl ethyl ketone peroxide. (Eduardo Gonzalez Direct testimony; Plaintiff Exh. 119)

349. In the June 8, 2001 inspection, EPA inspector Eduardo Gonzalez also smelled strong odors of solvents in the manufacturing areas where the resin solution is used. Several 55–gallon drums labeled "Resin Solution" were opened at the top. (Eduardo Gonzalez Direct testimony; Plaintiff Exh. 119)

350. On June 8, 2001, Jorge Ortiz and Gloria Alvarez Nieves were at the Cataño facility. EPA inspector Eduardo Gonzalez spoke with both of them. At the end of Eduardo Gonzalez' inspection of the Cataño facility on June 8, 2001, Eduardo had a discussion with Jorge Ortiz and Gloria Alvarez Nieves, told them that there were many questions that remained unanswered, and told them that a Notice of Violation/RCRA § 3007 Request for Information letter concerning Duramas (Distribuidora K–Aribe) would be sent to them. (Eduardo Gonzalez Direct testimony; Plaintiff Exh. 119)

351. In August 2001, EPA sent a Notice of Violation of RCRA and a RCRA § 3007 Information Request concerning the generation, storage, and disposal of wastes at the Cataño facility, by certified mail, return receipt requested, to Mr. Jorge Ortiz, Duramas (Distribuidora K–Aribe), P.O. Box 475, Cataño, Puerto Rico 00963. EPA employee Eduardo Gonzalez wrote this RCRA NOV and Information Request, and it was mailed to the specific address given to him personally by Jorge Ortiz. The Post Office returned the letter in September 2001 to EPA, marked "UNCLAIMED" after the third notice was given to Jorge Ortíz, Duramas (Distribuidora K–Aribe) to pick up the letter and the letter had not been picked up. (Eduardo Gonzalez Direct testimony; Plaintiff Exhs. 79, 228)

352. Gloria Alvarez Nieves is Jorge Ortiz's companion. (Betsy Ortiz Direct testimony)

353. Gloria Alvarez Nieves sometimes comes to Distribuidora Karibe facility. When Gloria Alvarez Nieves comes to the Distribuidora Karibe facility, she sometimes watches the cashier area. She sometimes watches the employees. She sometimes asks the employees what they are doing. When she asks Betsy Ortiz to do something, Betsy would follow her directions. (Betsy Ortiz Direct testimony)

354. On October 2, 2001, Gloria Alvarez Nieves was working at the Catano facility. On that date, EPA inspector Francisco Claudio Rios hand delivered a copy of this Notice of Violation of RCRA and the RCRA § 3007 Information Request to Gloria Alvarez Nieves at the Cataño facility. (Francisco Claudio Direct testimony; Plaintiff Exhs. 79, 80, 186)

355. Ms. Gloria Alvarez Nieves signed the first page of the Notice of Violation of RCRA and the RCRA § 3007 Information Request. (Francisco Claudio Direct testimony; Plaintiff Exh. 80)

356. Betsy Ortiz' testimony, on cross-examination by Defendants, that the signature of Gloria Alvarez Nieves on Plaintiff Exh. 80 is not the handwriting of Gloria Alvarez Nieves is not credible. The signature of Gloria Alvarez Nieves on Plaintiff Exh. 80 is very similar to that of Gloria Alvarez Nieves on other documents, e.g. the 1986 Certificate of Resolution on file with Banco Popular (original version in Spanish), Plaintiff Exh. 138. (Betzaida Ortiz Cross testimony, Plaintiff Exhs. 80 and 138)

357. The RCRA § 3007 Information Request requested that Jorge Ortiz, Duramas (Distribuidora K–Aribe) provide the requested information in writing, within thirty (30) calendar days of receipt of the request. It directed that the responses be mailed to Eduardo Gonzalez at EPA's Caribbean Environmental Protection Division in San Juan. (Plaintiff Exhs. 79, p. 2–3 (EPA 09931–EPA 09932))

358. A complete response to the RCRA § 3007 Information Request was due on November 1, 2001, thirty calendar days after the October 2, 2001 delivery.

359. On October 16, 2001, EPA inspector Eduardo Gonzalez visited the Cataño facility. He observed that the floor in the mixing room was heavily impacted with resins and pigments and several 55 gallon drums with a smelly solvent solution in the backyard. On that date, he spoke with Jorge Ortiz and they discussed the RCRA § 3007 Information Request. (Eduardo Gonzalez Direct testimony)

360. The discussion of the RCRA § 3007 Information Request on October 16, 2001 with Jorge Ortiz shows that Jorge Ortiz was aware of the RCRA § 3007 Information Request at that time.

361. No response to the RCRA § 3007 Information Request has been received. (Eduardo Gonzalez Direct testimony)

362. A true and accurate response to all of the questions in the RCRA § 3007 Information Request has been due and owing for more than 888 days.

363. Failure to respond in a timely and truthful manner to RCRA information requests is a very serious violation. EPA relies to a substantial extent on accurate self-reporting. EPA only has two RCRA inspectors for Puerto Rico and the Virgin Islands—an area that includes thousands of facilities potentially subject to the RCRA regulations. (Eduardo Gonzalez Direct testimony; Philip Flax Direct testimony)

364. Without timely and accurate information, EPA is severely and unduly impaired in its ability to determine a facility's compliance with the RCRA regulations and to undertake an enforcement action to protect the public and the environment if the facility is not in compliance. (Eduardo Gonzalez Direct testimony; Philip Flax Direct testimony)

365. EPA believes that it would continue to be useful to obtain a full and accurate response to the RCRA § 3007 Information Request. (Eduardo Gonzalez Direct testimony)

366. On December 3, 2002, EPA inspector Eduardo Gonzalez went to the Cataño facility to perform a RCRA inspection. On that date, he observed numerous open containers with wastes, some including liquids

and some emanating strong solvent odors. He also saw a partially finished swimming pool under construction. (Eduardo Gonzalez Direct testimony; Plaintiff Exh. 120)

367. On September 9–10, 2003, EPA inspector Eduardo Gonzalez went to the Cataño facility. EPA took samples. Sampling confirmed that some of the waste material at the Cataño facility was RCRA hazardous waste. Specifically, analyses of three samples DS–L–1, DS–L–2, and DS–L–3 showed that the wastes these samples were taken from at the Cataño facility had a flashpoint below 140 degrees Fahrenheit and were therefore RCRA ignitable hazardous wastes, and analyses of two other samples DS–S–3 and DS–S–4 showed that they were RCRA toxic hazardous wastes for lead. (Eduardo Gonzalez Direct testimony; Plaintiff Exhs. 179, 180 (pp. CAT 02144 and CAT 02145)).

5. *Control Over Environmental Decisionmaking at the Cataño Facility*

368. In the mid 1980's, Francisco Claudio Ríos, while employed by the Puerto Rico Environmental Quality Board ("EQB"), met with Jorge Ortiz and Gloria Alvarez Nieves at EQB offices. Jorge Ortiz and Gloria Alvarez Nieves were there to discuss environmental matters concerning the Cataño facility, then known as Dura Mas. The EQB air program had issued a Notice of Violation under the air regulations. (Francisco Claudio Direct testimony)

369. When Eduardo Gonzalez inspected the Cataño facility in June 2001, Jorge Ortiz was the person who authorized Eduardo Gonzalez to inspect the facility. (Eduardo Gonzalez testimony; Plaintiff Exh. 119)

370. In October 2001, EPA inspector Francisco Claudio Rios visited the Cataño facility. The purpose of the visit was to discuss the need for compliance of the Cataño facility with certain regulations under the Clean Air Act. The person he met with and discussed this matter with at the facility was Jorge Ortiz. Following the meeting, Mr. Claudio faxed Mr. Ortiz a list of regulated substances under the Clean Air Act. (Francisco Claudio Direct testimony; Plaintiff Exh. 227)

371. On May 13, 2002, Jorge Ortiz signed a "Notification of Regulated Waste Activity" on behalf of Distribuidora K–Aribe, certifying under penalty of law that the document was prepared under Mr. Ortiz' direction or supervision. Stipulated Fact No. 158; Plaintiff Exh. 103.

372. The Notification of Regulated Waste Activity concerns the Cataño property and identifies "Distribuidora K–Aribe" as the name of the installation (company) at that location. (Stipulated Fact No. 159)

373. Jorge Ortiz asked Monserrate Santiago to fill out the Notification of Regulated Waste Activity. (Stipulated Fact No. 160)

374. Monserrate Santiago testified that when she completed the EPA Notification of Regulated Waste Activity form (Plaintiff Exh. 103), she listed Pedro Santiago as the owner solely because Jorge Ortiz told her that Pedro Santiago was the owner. She had never met Pedro Santiago, never spoken to him, and never seen any documentation indicating he was the owner of Distribuidora K-aribe. (Monserrate Santiago Cross testimony)

375. The Notification of Regulated Waste Activity was submitted to EPA. The

box for treatment, storage, or disposal facility on the document was checked. The Notification said the Cataño property had zero RCRA listed hazardous waste. The Notification did not fill in any information concerning RCRA characteristic hazardous waste. (Stipulated Fact No. 161)

376. The Notification of Regulated Waste Activity does not answer the many specific questions contained in the RCRA Information Request. It does not say it is submitted as a purported response to the RCRA Information Request. It was sent to EPA's New York office and not to Eduardo Gonzalez, the EPA employee who sent out the request, at the EPA Caribbean Environmental Protection Division in San Juan. It was not a response to the RCRA Information Request and does not respond to the RCRA Information Request. (Plaintiff Exh. 79; Plaintiff Exh. 103; Eduardo Gonzalez Cross testimony)

377. Following unsuccessful attempts to contact the persons listed in the Notification of Regulated Waste Activity to obtain further information, EPA's New York office sent a letter to Monserrate Santiago notifying her that EPA had revoked the RCRA identification number for the Cataño facility for lack of verification. (Monserrate Cross testimony; Plaintiff Exh. 183; Stipulated Fact No. 162)

378. When EPA inspector Eduardo Gonzalez went to the Cataño facility to perform a RCRA inspection on December 3, 2002, he was initially delayed because the Cataño facility employee, Betsy Ortiz, was uncertain whether to provide access for a walk through inspection. Eduardo Gonzalez contacted Jorge Ortiz who authorized the access. (Eduardo Gonzalez Direct testimony; Plaintiff Exh. 120)

379. Jorge Ortiz has been and is the person in charge of making decisions regarding environmental matters concerning the Cataño facility. Since he is the overall person in charge of the Cataño facility and is the person in charge of making decisions regarding environmental matters, he is directly operating the Cataño facility with respect to environmental matters.

380. Jorge Ortiz is the operator of the Cataño facility both because he is the proprietor of Distribuidora K–Aribe, the main business operating at the Cataño property, and because he is also directly operating the Cataño facility with respect to environmental matters.

381. Jorge Ortiz is both the owner and the operator of the Cataño property.

## II. CONCLUSIONS OF LAW

### A. *Defendants are Liable for the United States Costs under CERCLA Relating to the J & G Site*

To establish liability under Section 107 of CERCLA, the United States need only establish that: (1) the site at issue is a "facility"; (2) there was a "release" or "threatened release" of a "hazardous substance" at the facility; (3) such release or threatened release caused the United States to incur response costs; and (4) the defendant falls into one of the four categories set forth in Section 107(a)(1)-(4). 42 U.S.C. § 9607(a); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1150 (1st Cir.1989).[16]

---

**16.** The United States' CERCLA cost recovery was brought under Section 107 of CERCLA.

Two of the four categories of parties upon which CERCLA imposes liability are: (1) the current owner or operator of the site or "facility"; and (2) an owner or operator of a "facility" at the time hazardous substances were disposed of there. 42 U.S.C. § 9607(a); *Dedham Water Co.*, 889 F.2d at 1150–51; *United States v. Cannons Eng'g Corp.*, 720 F.Supp. 1027, 1031–32 (D.Mass.1989), *aff'd*, 899 F.2d 79 (1st Cir.1990).

■ Those falling within the scope of Section 107(a) are liable for "all costs of removal or remedial action incurred by the United States . . . not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).[17] The standard of liability under Section 107(a) of CERCLA is strict, joint, and several. *United States v. Kayser–Roth Corp.*, 910 F.2d 24, 26 (1st Cir. 1990); *O'Neil v. Picillo*, 883 F.2d 176, 178–80 (1st Cir.1989).

In addition to the statutory scheme concerning liability *in personam* under Section 107(a), Section 107(1) of CERCLA provides a basis for the United States to recoup all or a portion of its response costs through an action *in rem* against property that is the subject of a cleanup effort. 42 U.S.C. § 9607(1). Section 107(1)(2) provides that the United States' response costs are a lien on the property which becomes effective either at the time the United States first incurs response costs with respect to the property or the time

the owner is provided with written notice of potential CERCLA liability, whichever is later. 42 U.S.C. § 9607(1)(2). Once the lien becomes effective, the United States is entitled to a judgment *in rem* upon a showing that (A) the site is owned at the time of filing of the complaint by a person who is liable to the United States under Section 107(a) of CERCLA; and (B) the site has been subject to or affected by a removal or remedial action.

Regarding the first element of liability, under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), "facility" is defined to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." *See United States v. Tropical Fruit, S.E.*, 96 F.Supp.2d 71, 84 (D.P.R.2000) (" 'facility' includes every conceivable place where hazardous substances come to be located"), citing *Dedham Water Co.*, 889 F.2d at 1151.

■ As set forth in Section B.2, D.1.d., D.4, E.2, E.3, E,5, and E.11 of the Findings of Fact above, Defendants used acetone, styrene, and other CERCLA hazardous substances in their fiberglass product manufacturing operations at the J & G Site; EPA inspectors saw piles of deteriorated, open, and/or leaking drums and stained soils, and sampling results confirmed that there were CERCLA hazardous substances in such drums and in the

The United States did not bring a claim under Section 106 of CERCLA, 42 U.S.C. § 9606. Accordingly, there was no need to show that there may have been an "imminent and substantial endangerment" to public health or welfare or the environment at the Site from the release or threat of release of a hazardous substance. Instead, all the United States is required to show is that there was a release or threat of a release of a CERCLA hazardous substance into the environment. In any event, in its Action Memorandum authorizing the removal action, EPA did find, neverthe-

less, that the conditions at the J & G Site presented an immediate public health threat and threat to the environment. (See Action Memorandum, Plaintiff Exh. 15 (also contained in the Administrative Record, Plaintiff Exh. 134, at tab 15), p. 9)

17. "Removal actions" are generally of a short term nature, whereas "remedial actions" are generally of a long term nature. *United States v. Northeastern Pharmaceutical and Chem. Co. ("NEPACCO")*, 810 F.2d 726, 731 (8th Cir. 1986).

soils. Accordingly, the J & G Site is a "facility" within the meaning of CERCLA.

Regarding the second element of liability, under Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), the term "release" is defined as:

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) ....

The term release or threatened release of hazardous substances at a site is very broad. *See Tropical Fruit,* 96 F.Supp.2d at 85–86. The Courts have interpreted the term "release" to include leaking drums or other containers, and the term "threatened release" to include corroded or otherwise deteriorated drums. *Dedham Water Co.,* 889 F.2d at 1152; *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1045 (2d Cir. 1985).

■ The definition of "hazardous substances," within the meaning of CERCLA, includes all the hazardous substances referred to in 40 C.F.R. § 302.4, including those listed in Table 302.4.[18] *Tropical Fruit,* 96 F.Supp.2d at 84. There is no quantitative threshold in the definition of "hazardous substances."[19] *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 259–63 (3d Cir.1992); *Johnson v. James Langley Operating Co.,* 226 F.3d 957, 962 (8th Cir.2000). Similarly, there is no minimum quantity or concentration threshold regarding whether there has been a "release" of a hazardous substance. *United States v. Western Processing Co.,* 734 F.Supp. 930, 936 (W.D.Wash.1990); *HRW Sys., Inc. v. Washington Gas Light Co.,* 823 F.Supp. 318, 340 (D.Md.1993).[20]

As set forth in Section E.2, E,3, E.5, E.6, E.7, E.8, and E.11 of the Findings of Fact above, during the period that JG–24 operated the J & G Site, there were many deteriorated, open, broken, and/or leaking drums at the Site. Some of them contained waste material.

■ Analyses showed that the waste material contained CERCLA hazardous substances, such as styrene and acetone, and that the waste material was also RCRA ignitable hazardous waste.[21] There were piles of such drums and many drums were stacked up and partially buried many feet high in a sinkhole at the Site. There were also stained soils. Analyses of the soil samples identified high levels of styrene, as well as dimethyl phthalate and arsenic, which are all CERCLA hazardous substances. Strong chemical odors were also perceived at the Site, and neighbors who lived approximately 1/4 to 1/2 mile to

---

**18.** Acetone, styrene, methyl ethyl ketone, methyl ethyl ketone peroxide, dimethyl phthalate, and arsenic are each listed in 40 C.F.R. § 302.4 and are therefore CERCLA hazardous substances.

**19.** While listed for convenience therein, the "reportable quantities" referred to in Table 302.4 relate solely to notification requirements under CERCLA Sections 102 and 103 and are irrelevant to liability under CERCLA Section 107. *A & W Smelter and Refiners, Inc. v. Clinton,* 146 F.3d 1107, 1110 (9th Cir.1998). *Cf. United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 721 (2d Cir.1993) ("RQs [reportable quantities] and CASRNs

are irrelevant for CERCLA liability purposes.").

**20.** Indeed, the United States does not need to show that there has been a release at all, as CERCLA provides for response to threatened releases, as well as releases themselves. *Dedham Water Co.,* 889 F.2d at 1152; *United States v. Mirabile,* 15 Envtl. L. Rep. (Envtl.L.Inst.) 20,992 –93, 1985 WL 97 (E.D.Pa. Sept. 6, 1985).

**21.** As explained in note 28 below, RCRA hazardous wastes are included within the definition of CERCLA hazardous substances.

the North of the Site complained of chemical odors from the Site, depending on the wind direction. There was evidence that a fire had occurred in an open air metal pole barn shed in the manufacturing area at the Site prior to April 1999. There were no stormwater runoff controls to prevent contamination in the soils from being carried to the sinkhole, which was a conduit to the underlying groundwater. Drums with waste materials were also burned in the open at the Site, releasing chemical odors. All of this shows that there was a release or threatened release of CERCLA hazardous substances to the environment at the Site.

■ Regarding the third element of liability, the term "response costs" is very broad and includes not only actual cleanup or removal activities, but also sampling, investigative, monitoring, oversight, and enforcement activities. 42 U.S.C. §§ 9601(23), (25), 9604(b). To satisfy the third element of liability, the Court need not determine the specific amount of recoverable response costs, but only need determine that the United States has incurred some response costs at the site. *See Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532, 1551 (W.D.Mich.1989); *United States v. Mottolo*, 695 F.Supp. 615, 630 (D.N.H.1988). Plainly, the United States incurred some response costs at the J & G Site.

■ Regarding the fourth element of liability, since CERCLA is a strict liability statute, Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), imposes liability on current owners of a facility regardless of when disposal occurred and regardless of causation. *United States v. Manzo*, 182 F.Supp.2d 385, 397 (D.N.J.2000); *New York v. Shore Realty Corp.*, 759 at 1042–44.[22] Also Section 107(a)(2) imposes liability on both the owner and the operator at the time of disposal of hazardous substances.[23] "Operator" is defined at 42 U.S.C. § 9607(20)(A) as any person operating the facility.

JG–24 is liable as an operator at the time of disposal because JG–24 employees carried out fiberglass product manufacturing activities in the 1990s through mid–2000 when disposal of hazardous substances occurred. As set forth in Sections B.2, D.1.d, D.4, E.2, E.3, E.5, E.8, and E.11 above, JG–24's fiberglass product manufacturing operations resulted in piles of deteriorated and/or leaking drums, some containing CERCLA hazardous substances, being deposited on the ground, in waste piles, and in the sinkhole, along with discharges of organic resin solvent vapors, burning of wastes, and burial of drums.

Jorge Ortiz is liable as (a) current owner, (b) an owner at the time of disposal, and (c) an operator at the time of disposal. Jorge Ortiz is liable both as a current owner of the J & G Site and as an owner at the time of disposal because Jorge Ortiz, along with Gloria Alvarez Nieves who is listed on the deed as his wife, purchased the J & G Site property in 1988 and continue to own the J & G Site property (see Section E.1 of the Findings of Fact).

■ Jorge Ortiz is also liable as an operator at the time of disposal because JG–24 is now a proprietorship, not a cor-

---

22. Within the meaning of Section 107(a)(1) of CERCLA, the current owner means the owner at the time of filing of the complaint. *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1554 (11th Cir.1990).

23. Under CERCLA, the term "disposal" includes "discharge, deposit, injection, dumping, spilling, leaking, or placing." Section 101(29) of CERCLA, 42 U.S.C. § 9601(29); Section 1004(3) of RCRA, 42 U.S.C. § 6903(3). The deposit of corroded and leaking containers that contain hazardous substances at a site constitutes disposal of hazardous substances. *United States v. Mottolo*, 695 F.Supp. at 623.

poration, and therefore Jorge Ortiz is liable for JG–24 which was an operator at the time of disposal. A person operating a business that is not a corporation, but a proprietorship, is personally liable for that business' liability. *United States v. Mottolo*, 695 F.Supp. at 623 (citing H. Henn & J. Alexander, *Laws of Corporations and Other Business Enterprises* § 18, at 58 (West Pub.3d ed.1983)); F. Gevurtz, *Corporation Law*, at 2–3 (West Group ed.2000); W.M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations*, §§ 2:05, 2:06 (West Group ed.1999). As set forth in Section D.1.c and d, JG–24 has lost its corporate status and has become a proprietorship, and Jorge Ortiz is the proprietor of JG–24.

▮ Moreover, even when JG–24 was nominally a "corporation," Jorge Ortiz was the alter ego of JG–24. A person who is the alter ego of a corporation, or the individual behind the corporate veil when pierced, is also personally liable for the corporation's liabilities.

▮ The general rule is that a corporate entity may be disregarded in the interests of public convenience, fairness, and equity. *Brotherhood of Locomotive Engrs. v. Springfield Terminal Ry.*, 210 F.3d 18, 26 (1st Cir.2000); *South Puerto Rico Sugar Corp. v. Sugar Board*, 88 P.R.R. 42, 55 (1963).[24] Factors frequently considered by the courts in making the determination as to whether to disregard the corporate entity are undercapitalization, nonpayment of dividends, nonfunctioning officers and directors, failure to observe corporate formalities, absence of corporate records, commingling of funds, and use of corporate funds for non-corporate uses. *Satellite Broadcasting Cable v. Telefonica de Espana*, 786 F.Supp. 1089, 1102 (D.P.R.1992); *United States v. Pisa-*

*ni*, 646 F.2d 83, 87 (3rd Cir.1981). The inability to accurately assess the assets and liabilities or capitalization of the corporation due to an absence of corporate records is an element of unfairness or injustice supporting piercing the corporate veil. *Labadie Coal Co. v. Black*, 672 F.2d 92, 99 (D.C.Cir.1982).

▮ The nonissuance of stock by a "corporation" is a factor supporting piercing the corporate veil. *GM Leasing Corp. v. United States*, 514 F.2d 935, 939–40 (10th Cir.1975); *Automotriz Del Golfo De California v. Resnick*, 47 Cal.2d 792, 306 P.2d 1 (1957). The individual who is the alter ego is the person in control and need not be a stockholder, *e.g.*, where no stock has been issued. *GM Leasing Corp. v. United States*, 514 F.2d at 939–40; *Labadie Coal Co.*, 672 F.2d at 97.

▮ Here, the facts set forth in Sections D.1.b. and d. and D.4 show that even when JG–24 had "corporate status," the corporate form should be disregarded and Jorge Ortiz found liable as an operator at the time of disposal as the alter ego of JG–24. Specifically, JG–24 was not a real corporation as there were no stockholders, no payment of "dividends" (since no stockholders), nonfunctioning officers and directors, failure to observe corporate formalities, absence of corporate records, and commingling of Jorge Ortiz and JG–24 funds through a joint bank account. Moreover, Jorge Ortiz hired the workers, decided what products would be produced, supervised the workers, and personally arranged for the raw materials for the fiberglass manufacturing operations. Thus, in the interests of public convenience, fairness, and equity, Jorge Ortiz was an operator at the time of disposal at the J & G Site as the alter ego of JG–24 and is also liable under CERCLA § 107 on that basis.

---

**24.** Each case is "sui generis" and must be decided in accordance with its own unique facts. *F.D.I.C. v. Martinez Almodovar*, 671 F.Supp. 851, 875 (D.P.R.1987).

The J & G Site is also liable under CERCLA § 107 *in rem.* Since a lien has been recorded on the Site pursuant to CERCLA § 107(l) and it is now established that Defendant Jorge Ortiz is liable under CERCLA § 107, the J & G Site is liable *in rem.* Since the notice procedures of CERCLA § 107(l) have been followed (see Section E.14 of the Findings of Fact), the United States is entitled to a judgment *in rem* against the J & G Site.

 Recoverable response costs include not only the costs of actual cleanup or removal activities, such as excavation and removal of drums and other wastes, *cf. United States v. Mottolo,* 695 F.Supp. at 618–19, but also the costs of sampling, site assessment, investigations, monitoring, oversight, and litigation and other enforcement costs. *See, United States v. Hardage ("Hardage II"),* 982 F.2d 1436, 1441 (10th Cir.1992); *United States v. American Cyanamid Co.,* 786 F.Supp. 152, 157 (D.R.I.1992). Moreover, recoverable response costs include indirect costs, as well as direct costs. *United States v. Northernaire Plating Co.,* 685 F.Supp. 1410, 1420 (W.D.Mich.1988), *aff'd sub nom. United States v. R.W. Meyer,* 889 F.2d 1497 (6th Cir.1989); *United States v. Findett Corp.,* 75 F.Supp.2d 982 (E.D.Mo.1999) (awarded EPA personnel and travel costs, indirect costs, contractor costs, costs pertaining to technical assistance provided by other agencies through inter-agency agreements, prejudgment interest, and DOJ payroll, travel and indirect costs), *aff'd,* 220 F.3d 842 (8th Cir.2000).[25] The United States is also entitled to prejudgment interest on its past response costs. *United States v. R.W. Meyer,* 889 F.2d at 1505; *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 528 (2d Cir.1996).

The United States is entitled to recover all costs of response actions incurred not inconsistent with the National Contingency Plan ("NCP"), 40 C.F.R. Part 300. *United States v. Kramer,* 757 F.Supp. 397, 435 (D.N.J.1991); *United States v. Marisol,* 725 F.Supp. 833, 845 (M.D.Pa.1989).

 In a cost recovery action, the burden of proof is on the defendant to establish that response actions were inconsistent with the NCP. *Hardage II,* 982 F.2d at 1442; *NEPACCO,* 810 F.2d at 747–48. In order to establish that EPA response actions were inconsistent with the NCP, the defendant must demonstrate that EPA acted arbitrarily and capriciously in selecting the response actions, based on the administrative record that was before the agency when making the selection. 42 U.S.C. § 9613(j); *Hardage II,* 982 F.2d at 1442; *United States v. Mexico Feed and Seed Co.,* 729 F.Supp. 1250, 1255–56 (E.D.Mo.1990); *cf. Conservation Law Foundation v. Evans,* 360 F.3d 21, 27 (1st Cir.2004).[26] Thus, unless the defendant satisfies this significant burden, all EPA

**25.** *See also United States v. W.R. Grace & Co.—Conn.,* 280 F.Supp.2d 1149, 1167–72 (D.Mont.2003) (discussing in detail and approving EPA's revised indirect cost rate methodology and noting, at 1169, that federal agencies are allowed flexibility to use different indirect cost methodologies because of differences in agency objectives and also that it is appropriate for EPA to include indirect costs of other agencies and contractors in its allocation base).

**26.** EPA's selection of a removal action is not arbitrary and capricious so long as it has considered the relevant factors specified in 40 C.F.R. 300.415(b)(2) and determined that a removal action, *e.g.* removal of drums or other containers that contain or may contain hazardous substances or pollutants or contaminants (40 C.F.R. 300.415(e)(7)), is appropriate. *See, e.g., United States v. Glidden Company,* 3 F.Supp.2d 823, 835–36 (N.D.Ohio 1997), *rev'd in part (on other grounds) and aff'd in part, United States v. 150 Acres of Land,* 204 F.3d 698 (6th Cir.2000). Cost-effectiveness is *not* a factor EPA is required to consider in selecting "removal ac-

response costs are not inconsistent with the NCP and therefore recoverable.[27]

■■■■ Defendants did not demonstrate that EPA acted arbitrarily and capriciously in investigating the Site or selecting the removal action. To the contrary, based on the abysmal condition of the Site in the December 3, 1997 inspection, followed by similar abysmal conditions seen in later inspections, EPA's efforts to investigate the Site and conduct sampling and analyses were not arbitrary or capricious. EPA's selection of the removal action was also not arbitrary or capricious. As set forth in the Action Memorandum for the removal action, EPA considered the relevant factors specified in the removal action section of the NCP (see 40 C.F.R. § 300.415(b)(2)), and found that many were applicable, including the threat of fire and explosion, hazardous substances in drums or other containers that may pose a threat of release, and high levels of hazardous substances in soils largely at or near the surface. Then EPA selected the removal, including excavation, of drums that contain or may contain CERCLA hazardous substances, as well as the removal of soils contaminated with CERCLA hazardous substances,[28] as the removal action. The removal action selected fits squarely within the types of actions considered standard removal actions under the removal action section of the NCP (see 40 C.F.R. § 300.415(e)). Thus, EPA's selection of the removal action was not arbitrary and capricious. Similarly, EPA's decision to conduct limited groundwater monitoring following drum removal to see if active groundwater remediation might be required was also not arbitrary and capricious. Accordingly, the United States' response costs incurred were not inconsistent with the NCP.[29]

---

tions" under the NCP. *United States v. American Cyanamid,* 786 F.Supp. at 162.

27. Specifically, the United States is not limited to recovery of only those costs that are "reasonable" or "necessary." Instead, the United States' costs are "presumed" to be reasonable unless Defendant shows that EPA's response actions were undertaken inconsistent with the NCP. *See United States v. NEPACCO,* 810 F.2d at 747–48. Defendants' assertions that government's costs are "grossly exaggerated," excessive, duplicative, not cost-effective, or improper do not establish inconsistency with the NCP and are no basis to deny recoverability of U.S. costs. *See Hardage II,* 982 F.2d at 1443; *United States v. Kramer,* 913 F.Supp. 848, 867 (D.N.J.1995).

28. The term "hazardous substances" under CERCLA is much broader than the term "hazardous wastes" under RCRA. As explained in *Dedham Water Company v. Cumberland Farms Dairy,* 889 F.2d at 1151–52 and n. 6, RCRA hazardous wastes are only one of 6 categories of CERCLA hazardous substances, which also include, but are not limited to, all of the substances designated as hazardous under the Clean Water Act and the Clean Air Act. Moreover, under CERCLA, hazardous substances need not be wastes. Thus, removal of soils or debris contaminated with CERCLA hazardous substances, such as styrene, plainly serves the purposes of CERCLA. *See also* Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

29. Defendants have complained that (a) EPA did not leave them split samples during the cleanup phase in the refrigerators they left on site and (b) EPA did not offer them the opportunity to "clean up" the Site themselves. Both of these complaints are not pertinent to the United States' CERCLA cost recovery claim.

As to the split sampling request, the issue is not pertinent because Section 107 of CERCLA provides for recovery of all costs of removal or remedial action incurred by the United States not inconsistent with the NCP, notwithstanding any other provision of CERCLA, including Section 104 of CERCLA (which contains the provision relating to split sampling). *See, e.g. United States v. Kramer,* 757 F.Supp. at 420–22; *New York v. General Elec. Co.,* 592 F.Supp. 291, 302–03 (N.D.N.Y.1984). In any event, Defendants did not request split samples during the investigatory stage of EPA's

■ Defendants' expert, Neftali Garcia, criticized certain aspects of EPA's investigations. Primarily he differed with EPA on some methodological issues, such as the number of background soil samples to be taken and the desirability of taking a local groundwater sample from an off-site well that was out of operation. However, "nothing in the NCP indicates that the PA [preliminary assessments] or SI [site investigation] must be performed in a particular way, or using a particular methodology." *HRW Sys. v. Washington Gas Light Company*, 823 F.Supp. 318, 333–34 (D.Md. 1993). Nothing in the NCP states whether EPA needs to obtain samples of groundwater from off-site sources or the number of background soil samples to be taken. There is no requirement in the NCP that EPA find actual groundwater contamination to have already occurred off-site before performing a removal action, whether it be a removal action to mitigate the threat of fire or explosion, a removal action to remove the source of potential groundwater contamination, or any other kind of removal action. Thus criticisms of methodology do not bear on consistency of response action selection with the NCP. Reasonable scientists can differ on methodology, and EPA must have the discretion to rely on its own scientists' determinations. *See, Marsh v. Oregon Natural Resources Council*, 490

U.S. 360, 377–78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

EPA has set up a standardized system of documenting its CERCLA response costs. The documentation of response costs maintained by EPA includes EPA payroll distribution time sheets, EPA travel vouchers and travel authorizations, invoices submitted by contractors, and related vouchers and payment documents. EPA compiles cost documentation packages for individual sites and prepares Superfund Cost Organization Recovery Package Imaging and On–Line System ("SCORPIOS") reports which detail costs according to categories, such as EPA payroll, travel, and contractual costs associated with response actions for a site. Courts have routinely held that such cost summaries, when supported by affidavit or trial testimony, are sufficient to establish the United States' response costs. *See, e.g., Hardage II*, 982 F.2d at 1442–43; *United States v. South Carolina Recycling and Disposal, Inc.*, 653 F.Supp. 984, 1007 n. 3 (D.S.C.1984), *aff'd in part and vacated in part on other grounds, sub nom. United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988).

As set forth in Section E.13 of the Findings of Fact, the United States established that is has incurred a total of

---

response actions, which were the basis of EPA's decision to conduct the removal action. The samples that were taken during the removal action were taken after the removal action was already selected and not oriented towards removal action selection.

As to the complaint that EPA did not offer the Defendants the opportunity to "clean up" the Site themselves, Section 104(a)(1) of CERCLA provides that EPA may allow the owner or operator of facility, or other person responsible for the pollution, to carry out the removal or remedial action only when EPA determines that such action "will be done *properly* and promptly" by such person. *See*

*United States v. Miami Drum Services*, 25 Envt. Rep. Cas. (BNA) 1469, 1986 WL 15327 at *9–10 (S.D.Fla. Dec. 12, 1986). Inasmuch as EPA observed that Defendants were attempting to "clean up" the Site by open burning and crushing and burial of drums, all of which was without a permit and illegal under RCRA, EPA could hardly make the determination that the Defendants would properly "clean up" the Site. Indeed, instead EPA sought a cease and desist order from this Court and the parties signed a Stipulation that included a cease and desist order, which was approved by the Court. (Sections E.9, E.10, and E.11 of the Findings of Fact)

$3,154,052.77, as of September 30, 2003, in response costs relating to the J & G Site, which included the costs of sampling, investigation, analyses, excavation, off-site disposal, groundwater monitoring, access, enforcement, and cost recovery activities.[30] Defendants did not meet their burden of establishing that the United States' response actions were inconsistent with the NCP.[31] Accordingly, the United States is entitled to recovery of $3,154,052.77 in CERCLA response costs through September 30, 2003, less the amount of $4,400.00 as cost for 22 roll off of non-hazardous drums at $200.00 per load.[32]

Defendants JG–24 and Jorge Ortiz are jointly and severally liable *in personam*, and the Defendant J & G Site is jointly and severally liable with them *in rem*, under Section 107 of CERCLA, 42 U.S.C. § 9607, to the United States in the amount of $3,149,652.77 for the costs of the United States' response actions with respect to the J & G Site in Vega Alta, Puerto Rico.

Since Defendant Gloria Alvarez Nieves has defaulted on the United States' CERCLA cost recovery claim and the United States established at trial that it is entitled to the recovery of its CERCLA costs, it is also appropriate to grant the United States' Motion for Default Judgment Against Gloria Alvarez Nieves (docket entry # 139) at this time. Defendant Gloria Alvarez Nieves is liable, *in personam*, jointly and severally, with Defendants Jorge Ortiz, JG–24, and the J & G Site.

### B. Defendants are Liable for Violations of RCRA at the J & G Site

Subchapter III of the RCRA, 42 U.S.C. §§ 6921–6939b, and the regulations promulgated thereunder, establish a comprehensive regulatory program for generators and transporters of hazardous waste and for owners and operators of facilities that treat, store or dispose of hazardous wastes. RCRA is the main federal law designed to protect the public from mishandling of hazardous wastes and to guard against the creation of new Superfund sites. *See United States v. Ekco Housewares, Inc.*, 62 F.3d 806, 809 (6th Cir. 1995).

The United States has authority pursuant to Section 3008 of RCRA, 42 U.S.C. § 6928, to enforce the requirements of RCRA and the regulations promulgated under Subtitle III of RCRA, and persons who fail to comply with RCRA regulations are subject to injunctive relief and penalties under Section 3008.

A "facility" under RCRA means "[a]ll contiguous land, and structures, other appurtenances, and improvements on the land, used for treating, storing, or disposing of hazardous waste." 40 C.F.R. § 260.10. "Solid waste" under RCRA means any ". . . discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining and agricultural operations, . . ." 42 U.S.C. § 6903(27). "Hazardous wastes" under RCRA means solid wastes under RCRA which are identified

---

**30.** These costs do not include costs incurred after September 30, 2003, such as the cost of the trial of this action, or prejudgment interest, both of which the United States is also entitled to recover. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

**31.** Defendants also failed to show that any of the United States' costs were not incurred with respect to the J & G Site. Since costs are

kept by CERCLA site identification numbers in EPA's accounting system, contractor costs incurred with respect to other sites in Puerto Rico are not included in the SCORPIOS cost summaries for the J & G Site. (Jo–Ann Velez Cross testimony)

**32.** See paragraph 239, page 44 of Removal Action.

or listed under Section 3001 of RCRA, 42 U.S.C. § 6921; 40 C.F.R. Part 261. These categories of hazardous wastes include, *inter alia*, ignitable wastes (D001), 40 C.F.R. § 261.21. The terms "treatment," "storage," and "disposal," for purposes of RCRA, are defined in 42 U.S.C. §§ 6903(3), (33), (34), and in 40 C.F.R. § 260.10. Leaving drums with wastes in them around is storage or disposal. Open burning of wastes and burial of wastes in the ground are forms of disposal.

As set forth in Sections E.5, E.7, E.8, E.10, and E.11, deteriorated, used drums, many open and leaking, were stored or disposed of in piles or lying on their side or partially buried in the sinkhole. JG–24 employees created these conditions in part by punching holes in drums of resin instead of using the bungholes that came with the drum. Some of these discarded drums had waste materials in them. Analyses confirmed that these waste materials contained RCRA ignitable wastes. The drums were stored or disposed of by discarding them into waste piles or the sinkhole or burying them in the ground for years until EPA sought a Court order for access to remove them. After that, Defendants disposed of some of the drums by burning, crushing, and burying them in the sinkhole to reduce the volume of drums and the chemicals within them. By the time of the EPA removal action, there continued to be some drums with RCRA hazardous wastes stored or buried at the Site. Thus, plainly, the J & G Site was a facility used for the treatment, storage or disposal of RCRA hazardous wastes.

As required by Section 3002 of RCRA, 42 U.S.C. § 6922, EPA promulgated regulations establishing standards applicable to generators of hazardous waste, which are contained primarily in 40 C.F.R. Part 262 and other provisions referenced therein. Under 40 C.F.R. § 262.12, generators of hazardous waste may not treat, store, dis-

pose of, transport, or offer for transport, hazardous waste without having received an EPA identification number. Generators who treat, store, or dispose of hazardous waste without having received an EPA identification number are in violation of 40 C.F.R. § 262.12.

As required by Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), EPA promulgated regulations requiring owners and operators of facilities at which RCRA hazardous waste are treated, stored, and/or disposed of to obtain a RCRA operating permit and prohibiting treatment, storage, and/or disposal of RCRA hazardous wastes except in accordance with the terms of such a permit. 40 C.F.R. Part 270. Owners and operators of facilities where RCRA hazardous wastes are treated, stored, and/or disposed of without a RCRA permit are liable for violations of Section 3005(a) of RCRA and 40 C.F.R. Part 270. "The receipt of a permit and compliance with that permit are at the core of the federal hazardous waste management system." *United States v. WCI Steel, Inc.*, 72 F.Supp.2d 810, 829 (N.D.Ohio 1999).

As required by Section 3004 of RCRA, 42 U.S.C. § 6924, EPA promulgated regulations establishing minimum performance standards applicable to owners and operators of facilities for the treatment, storage or disposal of hazardous waste, which are set forth in 40 C.F.R. Part 264. These minimum standards include, *inter alia*, obtaining an EPA identification number (40 C.F.R. § 262.11), submission of biennial reports to EPA (40 C.F.R. § 264.75), prevention of the unknowing or authorized entry of livestock (40 C.F.R. § 264.14), specific protections against fire and explosion (40 C.F.R. § 264.17 and Subpart C), maintaining liability insurance (40 C.F.R. § 264.147), proper use and maintenance of hazardous waste containers (40 C.F.R. Part 264, Subpart I), and provision of lin-

ers and leachate collection system prior to land disposal (40 C.F.R. Part 264, Subpart N). Failure to comply with each of these minimum standards is a separate violation of the RCRA requirements.

As set forth in Section E.10 of the Findings of Fact, Defendants Jorge Ortiz and JG–24, as the owner and/or operator of the J & G Site,[33] violated the following provisions of the RCRA requirements at the J & G Site:

1. Treated, stored, or disposed of hazardous waste at the facility without a RCRA permit in violation of RCRA Section 3005 and 40 C.F.R. Part 270. (They had no RCRA permit.)

2. Treated, stored, or disposed of hazardous waste generated at the facility without having received an EPA identification number under 40 C.F.R. §§ 262.12, 264.11. (They had no RCRA identification number.)

3. Did not submit biennial reports required under 40 C.F.R. § 264.75.

4. Did not prevent the unknowing or unauthorized entry of livestock as required by 40 C.F.R. § 264.14. (Livestock were allowed to wander and graze in the areas with wastes in drums and on the ground.)

5. Did not comply with requirements of 40 C.F.R. § 264.17 and Subpart C re fire and explosion protection. ("No Smoking" signs were not conspicuously posted, and there was no aisle space to allow emergency access to all waste drums.)

6. Did not comply with requirement under 40 C.F.R. § 264.147 of maintaining liability insurance. (They had no liability insurance for the Site.)

7. Did not comply with 40 C.F.R. Part 264, Subpart I requirements to assure proper use and maintenance of hazardous waste containers. (Hazardous wastes were left in leaking, deteriorated drums, instead of being transferred to drums in good condition and keeping the drums closed.)

8. Did not comply with requirements of 40 C.F.R. Part 264, Subpart N to provide a liner and leachate collection system prior to land disposal. (Drums, including those with hazardous wastes, were buried with no liner or leachate collection systems to protect the soils and the groundwater from contamination.)[34]

Section 3008(a), 42 U.S.C. § 6928(a), authorizes EPA to commence a civil action in the United States District Court in the district in which a RCRA violation has occurred for appropriate relief. Where there have been past violations, the Court may issue an injunction enjoining further activities in violation of RCRA. *United States v. T & S Brass and Bronze Works,* 681 F.Supp. 314, 322–23 (D.S.C.1988), *aff'd in part, vacated in part on other grounds,* 865 F.2d 1261 (4th Cir. 1988). Currently, there is a Stipulation (docket # 84), dated January 30, 2003, in effect that provides, in paragraph 2, that

---

**33.** Defendant JG–24 was an operator and Defendant Jorge Ortiz was both an owner and an operator while treatment, storage or disposal were ongoing at the J & G Site for the reasons stated previously regarding the CERCLA cost recovery claim.

**34.** There are limited exemptions to portions of the RCRA regulations for facilities that satisfy all of the conditions of the exemption.

The burden of establishing the applicability of an exemption under the RCRA regulations is on the person claiming the exemption. *United States v. Sims Brothers Constr., Inc.,* 277 F.3d 734, 741 (5th Cir.2001); *United States v. Eastern of New Jersey, Inc.,* 770 F.Supp. 964, 980–81 (D.N.J.1991). Defendants did not show or attempt to show that they met all of the conditions of any such exemption.

"Defendants Jorge Ortiz and JG–24, Inc. shall not conduct fiberglass product manufacturing or other activities involving CERCLA hazardous substances, including, but not limited to, acetone, styrene, methyl ethyl ketone peroxide, and ignitable solvents at the [J & G Site], unless authorized by the Court." This prohibition shall be continued as injunctive relief under RCRA.

█ Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), and 40 C.F.R. Part 19 provide for civil penalties of up to $25,000 per day per violation of RCRA requirements ($27,500 per day per violation after January 30, 1997). The Defendants, as owner and/or operator of the J & G Site, are liable for civil penalties for violations of RCRA requirements. Civil liability under RCRA is strict, joint and several. *United States v. Vineland Chem. Co.*, 31 Env't Rep. Cas. (BNA) 1720, 1728, 1990 WL 157509 (D.N.J. April 30, 1990), *aff'd*, 931 F.2d 52 (3d Cir.1991).

A central purpose of civil penalties under RCRA is deterrence. *United States v. Bethlehem Steel*, 829 F.Supp. 1047, 1057 (N.D.Ind.1993), *aff'd in part, vacated in part on other grounds*, 38 F.3d 862 (7th Cir.1995); *T & S Brass and Bronze Works*, 681 F.Supp. at 322–23. Although directed in part to the violators themselves,[35] the deterrent value of a substantial civil penalty is focused squarely on others to whom the law also applies:

> We must be clear to the regulated community that violations of the law are not treated lightly, especially where the regulations protect public health and the environment .... Too small a penalty risks being considered by violators as "an acceptable cost of violation, rather than as a deterrence to violation."

*United States v. Vineland Chem. Co.*, 31 Env't Rep. Cas. (BNA) at 1728. *See also, Ekco Housewares*, 62 F.3d at 816 ("The district court properly considered the deterrence effect not just on Ekco, but on the regulated community as a whole").

The Courts have awarded substantial civil penalties in RCRA cases. *See, e.g., United States v. Bethlehem Steel*, 829 F.Supp. at 1057; *United States v. WCI Steel, Inc.*, 72 F.Supp.2d at 833; *T & S Brass and Bronze Works*, 681 F.Supp. at 322–23; *United States v. Production Plated Plastics*, 35 Env't Rep. Cases (BNA) 1517, 1992 WL 397725 (W.D.Mich. Sept. 4, 1992), *aff'd*, 61 F.3d 904 (6th Cir.1995); *United States v. Environmental Waste Control, Inc.*, 710 F.Supp. 1172, 1245 (N.D.Ind.1989), *aff'd*, 917 F.2d 327 (7th Cir.1990)

Defendants' RCRA violations at the J & G Site were serious. In particular, Defendants' ongoing storage and disposal of hazardous wastes without first obtaining a permit is a very serious violation as the permit requirement is the central mechanism under RCRA for assuring that hazardous wastes are not being mismanaged at facilities without regard to public health and the environment. Essentially, all of the Defendants' fiberglass product manufacturing operations at the J & G Site have been illegal since their inception because— with limited exceptions the Defendants did not prove—under RCRA, the treatment, storage or disposal of RCRA hazardous wastes is not authorized until a RCRA permit is obtained. *See, United States v. Heuer*, 4 F.3d 723, 730 (9th Cir.1993). Coupled with the facts that the Defendants' wastes were ignitable, that they did not comply with RCRA requirements to safeguard against fires, and that they had

---

**35.** Defendant Jorge Ortiz continues to conduct fiberglass product manufacturing operations at the Cataño property.

no liability insurance, Defendants' RCRA violations were egregious.

Moreover, Defendants did not undertake good faith efforts to comply. Good faith efforts to comply are those done before the Defendant is caught. Here, Defendants did not undertake efforts to address the piles of leaking, deteriorated drums until they had been caught, and, even then, a major part of their efforts consisted of even worse types of disposal without a permit—open burning, crushing, and burying.

■ In view of the serious nature of the violations, the need for deterrence to the Defendants and the regulated community, and the Defendants' lack of good faith efforts to comply, this Court will assess the Defendants civil penalties of $1,500 per day for the 500 day period of violation which commenced at least by April 14, 1999 and continued through August 2000, for a total of $750,000.

## C. *Defendants are Liable for Failure to Provide Access to the J & G Site*

Under Section 104 of CERCLA, when there is a release or threat of a release of a CERCLA hazardous substance into the environment, EPA is authorized to conduct response actions, including, but not limited to investigations, monitoring, surveys, testing, and information gathering. 42 U.S.C. § 9604(a), (b).

Section 104(e)(1) of CERCLA, 42 U.S.C. § 9604(e)(1), authorizes EPA to enter a vessel, facility, establishment, or other place or property pursuant to Sections 104(e)(3) and (4), 42 U.S.C. §§ 9604(e)(3) and (4), if there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant. Based on its December 3, 1997 and February 1998 inspections and initial sampling (see Section E.2 and 3 of the Findings of Fact), EPA had a rea-

sonable basis to believe that there was a release or threat of release of a hazardous substance or pollutant or contaminant at the J & G Site when it requested access to the Site for additional sampling and investigation following the February 1998 inspection and initial sampling.

Section 104(e)(5)(B) of CERCLA, 42 U.S.C. § 9604(e)(5)(B), authorizes the President, through the Attorney General, to commence a civil action to compel compliance with a request for entry. Under Section 104(e)(5)(B) and 40 C.F.R. Part 19, the Court is also authorized to assess civil penalties not to exceed $25,000 per day ($27,500 per day for violations after January 30, 1997) for unreasonable failure to provide access in response to a request for entry.

The United States sought herein civil penalties for Defendants' failure to provide requested access for additional EPA sampling and investigative activities pursuant to an Administrative Order EPA issued to the Defendants in February 1999. Although the United States sought voluntary access unsuccessfully from the Defendants for these additional EPA sampling and investigative activities in June and October 1998 also, the United States limited its request for civil penalties to the period following issuance of an Administrative Order in 1999. Specifically, as set forth in Section E.4 of the Findings of Fact, in February 1999, EPA issued an Administrative Order Directing Compliance With Request For Access to JG, pursuant to Section 104(e)(5) of CERCLA, 42 U.S.C. § 9604(e)(5), that was hand delivered to and signed for by Rodes (a/k/a Rothes) Gonzalez, an employee of Jorge Ortiz at the Cataño facility, on March 3, 1999. Additional copies of the Administrative Order were delivered by hand to the J & G Site and to Jorge Ortiz' residence. The Administrative Order became effective six (6)

business days after receipt. Defendant JG failed to comply with, or even respond to, EPA's Administrative Order, making it necessary for the United States to go to the United States District Court for a warrant of entry to conduct investigation and sampling activities. The warrant was executed on April 14, 1999. There was a period of approximately 34 days between the date the Administrative Order became effective and the date EPA gained access to the Site with the warrant.

■ Service on an employee, other agent, or business office is sufficient service of administrative orders, administrative subpoenas, or other administrative information requests. *See United States v. Custodian of Records, Southwestern Fertility Center,* 743 F.Supp. 783, 787 (W.D.Okl.1990) (service on receptionist); *United States v. Jolly,* 238 F.3d 425 (Table), 51 Env't Rep. Cases (BNA) 2083, 2000 WL 1785533 at *5–6 (6th Cir.2000) (service sufficient where request was faxed to office fax number and there was a fax confirmation that the letter had been successfully delivered); *United States v. Ponderosa Fibres,* 178 F.Supp.2d 157, 159 (N.D.N.Y.2001) (request received by telecopier). *See also, United States v. Gurley,* 235 F.Supp.2d 797, 800–01 (W.D.Tenn. 2002) (employee and wife). While Rodes Gonzalez was an employee at Jorge Ortiz' Cataño facility, rather than at the J & G Site, service of the Administrative Order on Ms. Gonzalez was sufficient service, since Jorge Ortiz is and was the proprietor or alter ego of the companies that operated at both facilities.

Since the activities EPA sought to conduct at the J & G Site were of the type that are authorized by Section 104(e)(1) of CERCLA, 42 U.S.C. § 9604(e)(1), Defendant JG–24's and Defendant Jorge Ortiz' failure to comply with, or even respond to, EPA's Administrative Order request for access to conduct investigation and sam-

pling activities was unreasonable. As stated in *United States v. M. Genzale Plating, Inc.,* 807 F.Supp. 937, 939 (E.D.N.Y.1992), "[w]ithout access, the EPA cannot act in the first instance to identify serious health and environmental hazards and take steps to remedy them." Therefore, the denial of access to a CERCLA site is one of the most serious types of violations.

■ In view of the serious nature of the violation and the need for deterrence, the Court awards the United States $3,000 per day for the 34 day period of violation, for a total amount of $102,000. Although the Administrative Order was addressed to JG–24, Jorge Ortiz is also personally liable for JG–24's failure to respond, since, as explained above, he is and was the proprietor and/or alter ego of JG–24. Accordingly, JG–24 and Jorge Ortiz are jointly and severally liable for the penalties of this violation.

**D. *Defendants Jorge Ortiz and Duramas are Liable for Failure to Respond to RCRA Information Request Concerning the Cataño Facility***

■ Section 3007(a) of RCRA, 42 U.S.C. § 6927, provides that any person who generates, stores, treats, transports, disposes of, or otherwise handles or has handled hazardous wastes shall, upon request of EPA, furnish information relating to such wastes. Both owners and operators of facilities where wastes are or have been generated, stored, treated, transported, disposed of, or otherwise handled are persons who are subject to the information request authority of Section 3007(a) of RCRA. *United States v. Charles George Trucking Co.,* 823 F.2d 685 (1st Cir.1987); *United States v. Liviola,* 605 F.Supp. 96 (N.D.Ohio 1985).

The First Circuit has recognized that the RCRA information request authority is central to "the government's ability to bat-

tle the polluters and the despoilers." *Charles George Trucking Co.*, 823 F.2d at 689. The United States is entitled to obtain injunctive relief and civil penalties for noncompliance with RCRA information requests under Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a)(g).

On October 2, 2001, EPA served a Notice of Violation ("NOV") of RCRA and a RCRA Information Request pertaining to the Cataño facility addressed to Jorge Ortiz, Duramas (Distribuidora K–Aribe) by in-hand service on Gloria Alvarez Nieves at the Cataño facility. Gloria Alvarez Nieves was an employee or manager at that facility and is the companion of Jorge Ortiz. She is listed as his wife in the deed to the J & G Site. Service of information requests and other administrative requests on related persons, such as employees or wives, who would be expected to provide the document to the principal, is sufficient. *See, United States v. Gurley*, 235 F.Supp.2d at 800–01 (service on employee and wife).[36] Moreover, in a conversation with Jorge Ortiz on October 16, 2000, EPA employee Eduardo Gonzalez discussed the RCRA Information Request with Defendant Jorge Ortiz, and Jorge Ortiz was aware of the request.

The RCRA Information Request asked for a complete response within thirty days. The Information Request asked very specific and detailed questions and asked that a reply be sent to RCRA inspector Eduardo Gonzalez in the EPA Caribbean Environmental Protection Division in San Juan. No response was ever received. Defendant Jorge Ortiz and Duramas, Inc. ("Duramas" or "Dura Mas"), a/k/a Fiberglass Dura Mas, Inc. ("Fiberglass Dura Mas"), have violated and continue to violate the requirements of Section 3007(a) of RCRA by failing to respond to that information request.

Defendant Duramas, a/k/a Fiberglass Dura Mas, is liable as an owner of the Cataño facility, since its name is on the deed to the Cataño property, and it is stipulated that the property is owned in the name of Fiberglass Dura Mas, Inc.

Defendant Jorge Ortiz is liable as an owner of the Cataño property through Fiberglass Dura Mas because Fiberglass Dura Mas is another proprietorship of Jorge Ortiz. As set forth in Section D.3 of the Findings of Fact, Jorge Ortiz continues to conduct business as Fiberglass Dura Mas or Dura Mas, including transactions with suppliers, advertisements in the phone book, sales of products, credit card transactions, and checking account transactions. He is the proprietor of Fiberglass Dura Mas because he is the sole person authorized to use the Fiberglass Dura Mas bank account and the sole beneficiary thereof, he allows Distribuidora K–Aribe to use the Fiberglass Dura Mas property without paying any rent, and he directs his JG–24 employees Efrain Vazquez, Carmelo Mejia, and Manuel Rodriguez to conduct fiberglass product manufacturing at the Fiberglass Dura Mas property.[37] Just as Jorge Ortiz and JG–24 are jointly and severally liable as proprietor and proprietorship with respect to the J & G Site, Jorge Ortiz and Fiberglass Dura Mas/Duramas are jointly and severally liable as proprietor and proprietorship with respect to the Cataño property.[38] *United States v.*

---

**36.** The Court in *Gurley* imposed civil penalties not only for the period after the information request was served on the employee and the wife, but also for the period during which the envelopes containing the information request were being returned to EPA unaccepted and unopened. *United States v. Gurley*, 235 F.Supp.2d at 800–01, 808–09.

**37.** The parties agree that Fiberglass Dura Mas is not a corporation. *See* Finding of Fact D.2–4.

**38.** There was no need to serve Duramas separately with the Amended and Supplemental Complaint in this action, since Jorge Ortiz is the proprietor of Duramas.

*Mottolo,* 695 F.Supp. 615, 623 (D.N.H. 1988) (citing H. Henn & J. Alexander, *Laws of Corporations and Other Business Enterprises* § 18, at 58 (West Pub.3d ed.1983)); F. Gevurtz, *Corporation Law,* at 2–3 (West Group ed.2000); W.M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations,* §§ 2:05, 2:06 (West Group ed.1999).

Defendant Jorge Ortiz is also liable as an operator of the Cataño facility because Distribuidora K–Aribe, the main business currently operating at that facility, is yet another proprietorship or alter ego corporation of Jorge Ortiz. As set forth in Section D.2 of the Findings of Fact, while Distribuidora K–Aribe was once incorporated under the name DT Karibe, Inc., that corporation was a temporary two-year corporation which has since expired, and no efforts to extend or renew the corporation are on record. Accordingly, Distribuidora K–Aribe is also presently just a proprietorship. Jorge Ortiz is also the proprietor of Distribuidora K–Aribe because (1) he is the only individual named authorized to control Distribuidora K–Aribe bank account (actually named DT Karibe), which is a joint account between himself and Distribuidora K–Aribe, (2) he is overall manager in control of the operation, (3) he is involved with purchasing, (4) he interviews and hires employees, (5) he supervised all the employees, (6) he writes all the checks, including checks for his personal expenses, such as checks to his attorney in this litigation[39] and payments for condominium fees on behalf of his companion Gloria Alvarez Nieves.[40]

Even if Distribuidora K–Aribe is still a "corporation," Jorge Ortiz is still liable for failing to respond with regard to RCRA Information Request because he is the alter ego of Distribuidora K–Aribe. As with the other companies, the factors for piercing the corporate veil are present, *e.g.,* no stockholders, nonfunctioning (nonexistent) officers and directors, nonpayment of dividends, failure to observe corporate formalities, absence of corporate records, commingling of funds both between Distribuidora K–Aribe and other Jorge Ortiz companies and between Distribuidora K–Aribe and Jorge Ortiz, and use of funds for noncorporate uses. *See* Section D.2, Findings of Fact. Thus, even if Distribuidora K–Aribe were still a "corporation," Jorge Ortiz is liable as an operator of the Cataño facility as the alter ego of Distribuidora K–Aribe.[41]

Finally, Jorge Ortiz is also liable for failure to respond with regard to the RCRA Information Request because he is directly liable as an operator of the Cataño facility under the principles of *United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). In that case, the Supreme Court stated:

> [A]n operator is simply someone who directs the working of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of [the statute's] concern with environmental contamination, an operator must manage, direct or conduct operations specifically related to pollution, that is operations having to do with leakage or disposal of hazardous waste, or deci-

---

**39.** The payments to the attorneys are personal expenses because Jorge Ortiz is named as an individual in this litigation.

**40.** Since a proprietorship is essentially an individual doing business under a business name, Distribuidora K–Aribe is also liable. *Cf. Mottolo,* 695 F.Supp. at 623.

**41.** Even if Distribuidora K–Aribe were still a "corporation," Distribuidora K–Aribe would also be liable along with Jorge Ortiz as the alter ego because piercing the corporate veil goes in both directions. *See FDIC v. Martinez Almodovar,* 671 F.Supp. at 877.

sions about compliance with environmental regulations.

See also, Browning–Ferris Indus. of Ill. v. Ter Maat, 195 F.3d 953, 955–956 (7th Cir. 1999); United States v. Jones, 267 F.Supp.2d 1349, 1355–56 (M.D.Ga.2003).

As set forth in Section F.5 of the Findings of Fact, Defendant Jorge Ortiz has been the person responsible for making decisions about compliance with environmental regulations at the Cataño facility for a long time. Back in the mid–1980s, he represented the Cataño facility under the name Dura Mas in discussions with the Puerto Rico Environmental Quality Board about a Notice of Violation under the air regulations. In December 1997, employee Rodes Gonzalez refused to answer any questions by EPA inspectors, saying the manager "Joaquin Roman" will answer any questions. In June and October 2001, Jorge Ortiz was the person who authorized EPA inspectors to inspect the Cataño facility and with whom they spoke about environmental matters, such as the RCRA Information Request and Clean Air Act regulations. In May 2002, Jorge Ortiz signed a "Notification of Regulated Waste Activity" form on behalf of Distribuidora K–Aribe, certifying under penalty of law that the document was prepared under Mr. Ortiz' direction or supervision. In December 2002 employee Betsy Ortiz would not allow EPA inspector Eduardo Gonzalez to inspect the Cataño facility without obtaining the permission of Jorge Ortiz. Accordingly, because Jorge Ortiz is the manager in overall control of the Cataño facility and has been the person making decisions regarding compliance with environmental requirements, Jorge Ortiz is also liable for not responding to the RCRA Information Request as an operator of the Cataño facility under the principles of United States v. Bestfoods, supra.

] Under RCRA, EPA relies to a substantial extent on accurate self-reporting. Because failure to respond completely, truthfully, and timely to information requests stymies EPA enforcement efforts to protect the public and the environment, such violations deserve substantial penalties. Cf., United States v. Gurley, 235 F.Supp.2d 797 (W.D.Tenn.2002).

 Defendants have failed to provide the responses to the RCRA Information Request for a period of at least 888 days. In view of the importance of obtaining timely and accurate responses to RCRA Information Requests and the need for deterrence both as to the Defendants and others who might consider ignoring such information requests, the Court awards the United States $400 per day of the first 428 days of violation (from November 2, 2001 until January 3, 2003, the date of Defendants' initial response to the United States' First Set of Interrogatories in this action) and $200 per day for the next 460 days of violation (from January 4, 2003 until April 7, 2004, the last day of trial in this action), for a total amount of $263,200. Defendants Jorge Ortiz and Duramas (a/k/a Fiberglass Dura Mas, Inc.), as owner and/or operator of the Cataño facility, are jointly and severally liable, for the penalties of this violation.

## CONCLUSION

In view of the above, **JORGE ORTIZ and JG–24 are jointly and severally liable in the amount of $4,001,652.77 and JORGE ORTIZ and DURAMAS (a/k/a FIBERGLASS DURA–MAS, INC.) are severally and jointly liable in the amount of $263,200.**

Further, although the Defendants' response to the United States' First Set of Interrogatories included some information that had been requested in the RCRA Information Request, most of the questions of the RCRA Information Request remain unanswered. Since Defendants re-

main under the obligation to fully respond, it is hereby ORDERED that defendants Jorge Ortiz and Duramas shall provide a complete and accurate response to the RCRA Information Request to EPA within thirty (30) days.

IT IS SO ORDERED.